Filed 11/2/15  P. v. Soto CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068485 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF1200514) |
| JUAN CARLOS SOTO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Angel M. Bermudez, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Adrianne Denault, and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Juan Carlos Soto of two counts of aggravated sexual assault on a child under 14 years old (Pen. Code, § 269, subd. (a)(5)[1] [sexual penetration]) and six counts of forcible lewd acts on a child under 14 years old (§ 288, subd. (b)(1)).  Soto appeals the judgment on various grounds.  He contends:  (1) the trial court erred by admitting portions of a detective's testimony into evidence; (2) the court erred by failing to sua sponte instruct the jury on impermissible uses of the detective's testimony; (3) Judicial Council of California Criminal Jury Instructions CALCRIM No. 1111, regarding forcible lewd acts, is biased toward the prosecution; (4) there was insufficient evidence of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury" to support Soto's convictions under section 288, subdivision (b)(1); and (5) the court erred by not holding an evidentiary hearing on an allegedly sleeping juror.[2]  We reject Soto's contentions and affirm.

FACTUAL BACKGROUND

In 2001, the victim, Jane,[3] was six years old and the youngest girl in her home. She lived with her parents, four minor siblings (two older sisters, two younger brothers), and 21-year-old Soto.  Soto is Jane's cousin, but was called her "uncle" because he had been raised as a brother to Jane's father.  Soto had moved from Mexico the year before

---

[1]    Unless otherwise indicated, further statutory references are to the Penal Code.

[2]    Soto withdrew his claim of error that sexual penetration of a minor under 14 (§ 289, subd. (j)) is a lesser included offense of aggravated sexual assault (§ 269, subd. (a)(5) [sexual penetration]) based on the statutes in effect at the time the offenses were committed.  Accordingly, we do not address that issue.

[3]    "Jane Doe" was the name used at trial to protect the victim's true identity.

2

and had his own room in the garage of the family home. When Jane's parents were at work or in Mexico for the weekend, Soto was the only adult present and generally left "in charge" of the children. He was a grown man, taller and stronger than Jane, and worked in construction when he could find work.

At trial, with the record reflecting that she was rocking herself, sobbing, or shaking during the vast majority of her testimony, 18-year-old Jane recalled three major sexual incidents involving Soto between 2001 and 2004, among numerous other instances of sexual touching she could not recall in detail. The first time she could remember, Jane and Soto were in the living room when she heard an ice cream truck. Jane followed Soto into his bedroom, where he put money on top of his closet out of her reach and indicated she must try and get the money. Then, Soto lifted Jane up at the waist, and as she was trying to reach for the money, he used his fingers to touch and/or rub her vaginal area over her clothes, for at least several minutes. Jane kicked and tried to push Soto away, and eventually, he put her down. Outside, Jane told her 12-year-old friend Michelle what had happened, but Michelle did not believe her.

The next incident that Jane could remember occurred when she was seven. While standing in Soto's bedroom, he held Jane in front of the mirror (her back against his chest), pulled her legs open with each hand, lifted up her dress to the middle of her stomach, reached one hand underneath her underwear, used his fingers to penetrate her vagina, and moved his fingers around in a circle. Jane did not understand what was happening until Soto began touching her; she tried to close her legs, but he used one hand

3

to hold them open while digitally penetrating her with his other hand. He stopped when the voice of Jane's older sister could be heard outside the room.

The next incident was described as the "big" incident during trial. Jane was nine years old and her parents were out of town for the weekend. She was sitting on her mother's bed when Soto approached and said there was a butterfly inside the house. He led Jane into her brother's room, indicating that the butterfly had gone in there. He then picked her up, pulled down her pants, touched her vagina with his hands, began licking her ear, and whispered softly to her in Spanish. Soto next took Jane into his own bedroom, where she felt him penetrate her anus with something, and it hurt. Jane was scared, did not understand what was happening, and wanted him to stop, but she did not try to speak or move. Soto then flipped Jane over onto her back, put a blanket over her face, and she felt him put his mouth on her bare crotch and lick her vagina for several minutes. Finally, she felt him penetrate her vagina, which hurt more than the previous digital penetration. The next day, the bottom half of Jane's body was in significant pain like she had gotten "beat," it hurt her to urinate, she was sore, and she could barely sit.

Soon after the "big" incident, Jane told Michelle about what had happened, and Michelle told Jane's mother, Kelly. Kelly recalled occasions when Jane's vaginal area had been extremely red after being left with Soto, and concluded that Jane was telling the truth. Kelly kicked Soto out of the house shortly thereafter and never let him back in. She wanted to call the police, but her husband (Jane's father) told her not to—a dispute that almost ruined their marriage. For years afterwards, Jane tried to hurt herself and suppress memories of the abuse, until finally, she attempted suicide. Jane revealed to a

4

therapist that she had tried to kill herself because of what Soto had done to her, and the therapist mandatorily reported the suspected sexual abuse to the police.

The police helped Jane make a recorded "pretext" call to Soto, during which she confronted him and he admitted to touching her in a sexual way. Then, in a custodial interrogation, Soto admitted to several instances of inappropriately touching Jane's breasts, buttocks, and vagina, when he had been living with her. He further admitted that he had touched Jane's vagina underneath her clothes, but denied any acts of penetration or sex, stating that penetrative acts were "too serious." He told police that he knew what he had done to Jane was wrong.

## DISCUSSION

### I.    *Admissibility and Instructions Regarding Detective's Testimony*

A.    Admissibility

The last witness of the People's case-in-chief was Detective Ryan Deanne (Detective), the officer who worked with Jane on her pretext call to Soto and subsequently interrogated Soto and obtained his confession. Soto contends Detective provided expert testimony on child sexual abuse accommodation syndrome (CSAAS) by testifying about "delayed disclosures" of abuse, and the testimony should be inadmissible for all purposes in California trials. He concedes there were no objections to Detective's testimony during trial. The People contend there was no CSAAS evidence, the phrase "child sexual abuse accommodation syndrome" was never mentioned at trial, the issue has been forfeited, and in any event, Detective's testimony was properly admitted.

Detective first testified about his background and experience investigating hundreds of sexual assault and child abuse cases. One to two pages of his testimony then pertained to whether, during his investigations, victims had delayed or failed to disclose instances of abuse:

> "Q. In the cases that you've investigated, is it common for victims to not disclose immediately after the touching occurs?
>
> "A. That's very common. In fact, it's usually more common that the child does not disclose right away than it is that the child does disclose right away.
>
> "[¶] . . . [¶]
>
> "Q. Have you seen -- or it is common for parents or other family members to -- even if they know or suspect child molestation is going on to not report it?
>
> "A. And surprisingly that's common, as well. A lot of times family want to handle their business within their family. It's something that's maybe shocking, but it happens more times than you think."

The majority of Detective's testimony concerned how he had learned of the alleged acts of sexual assault in Jane's case, his investigation of Soto, and information relevant to the interrogation, including whether trained officers will often minimize the gravity of certain acts or appear nonjudgmental about acts of child molestation. The recordings of the pretext call and lengthy interrogation were played to the jury while Detective was on the stand. Finally, during cross-examination, Detective was principally questioned about his interrogative techniques and what Soto had actually confessed to (or not).

To preserve an evidentiary issue for appeal, the complaining party generally is required to make a timely and meaningful objection in the trial court. (Evid. Code, § 353,

6

subd. (a).) The purpose of this rule "is to encourage a defendant to bring any errors to the trial court's attention so the court may correct or avoid the errors and provide the defendant with a fair trial." (*People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060.) " 'In requiring an objection at trial, the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error.' " (*People v. Williams* (2008) 43 Cal.4th 584, 624 [record at trial was not developed, credibility could not be assessed, and curative actions could not be taken].)

We conclude the issue has been forfeited. Soto did not object or move to exclude Detective's testimony during trial proceedings. Now, there is a basic dispute as to whether Detective's testimony even constituted expert evidence on CSAAS and for what purposes he was called as a witness—issues that were not brought to the trial court's attention and could have been resolved. According to case law, CSAAS is a therapeutic tool describing five stages or common reactions of children suffering from sexual abuse, and may help to explain behaviors that jurors would otherwise find inconsistent with abuse. (See generally *People v. Stark* (1989) 213 Cal.App.3d 107, 116 (*Stark*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 389.) Detective was not represented to be an expert on CSAAS, he did not reference any kind of "syndrome" or "condition" of children suffering from child abuse, and he is not a psychologist or psychiatrist or other obviously qualified candidate to speak on the subject. We disagree with Soto that an objection or timely motion to exclude would have been futile, because the trial court could have questioned the prosecution's intentions, limited the scope of Detective's direct

7

examination, or taken appropriate curative measures if necessary. Detective's testimony was properly admitted.

B.      Jury Instructions

Next, assuming that Detective provided expert evidence on CSAAS, Soto contends the court erred by failing to sua sponte instruct the jury that the evidence could not be used to prove Jane had been abused, but could only be used to evaluate whether Jane's conduct was not inconsistent with someone who had been abused. (See CALCRIM No. 1193.) Soto did not request a limiting jury instruction. Courts are split on whether a trial court has a sua sponte duty to provide a limiting instruction regarding CSAAS evidence, or, in contrast, whether an instruction must be requested by defense counsel. (*Stark*, *supra*, 213 Cal.App.3d at p. 116 [instruction required only "if requested"]; *People v. Housley* (1992) 6 Cal.App.4th 947, 959 (*Housley*) [holding trial courts have a sua sponte duty to provide limiting instruction "in all cases in which an expert is called to testify regarding CSAAS"].)

We need not address this conflict. As discussed above, Soto has not established that Detective provided CSAAS evidence or he was called as an expert to testify regarding CSAAS. Moreover, any instructional error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 837.) It is not reasonably probable that the jury would have returned a favorable verdict for Soto if a limiting instruction had been given. Soto confessed he had wrongfully touched Jane on various occasions in a sexual manner. Based on their testimony, Jane and Kelly's actions were consistent with Jane having been sexually molested. Jane told an older friend and her mother about the "big" incident soon

8

after it happened.  In addition, Kelly explained that she had fervently wished to go to the police, but her husband told her not to, which almost ruined their marriage.  Instead, she chose to throw Soto out of the house.  Thus, the jury had a substantial basis to conclude that Jane was telling the truth irrespective of any "delayed disclosure" testimony.

Finally, the potential for misuse of the challenged testimony was minimal under the circumstances.  The risk inherent in admitting CSAAS evidence is the jury may accord undue weight to an expert's opinion (usually a doctor or psychologist) that the victim's behavior was typical of abuse victims, "an issue closely related to the ultimate question of whether abuse actually occurred."  (*Housley*, *supra*, 6 Cal.App.4th at p. 958.)  In contrast, Detective was speaking about his observations generally, and his experiences in the field varied greatly—he had seen children report their abuse "right away," not until decades afterwards, or "anywhere in the middle."  Thus, Detective did not create a profile of child abuse victims nor imply there was one, and he certainly was not opining whether Jane had been abused.  Finally, the jury was properly instructed on how to consider expert witness testimony.

We therefore conclude that any instructional error was harmless because it is not reasonably probable that Soto would have obtained a more favorable result had a limiting instruction been given.

## II.  *CALCRIM No. 1111*

Soto challenges the use of CALCRIM No. 1111 on the grounds the instruction unfairly favors the prosecution, is impermissibly argumentative, is duplicative, and diminishes the weight of certain facts that are pertinent to the jury's evaluation of the

9

evidence. He asserts use of CALCRIM No. 1111 therefore violated his constitutional rights, and for that same reason, his failure to object at trial did not result in forfeiture of the claim on appeal. Assuming Soto's constitutional rights are at issue here and we consider his challenge to the instruction on the merits, we conclude there was no error.

CALCRIM No. 1111 instructs the jury on the elements of the crime of committing a forcible lewd act with a child, in violation of section 288, subdivision (b)(1). The instruction, as read to the jury, states the People must prove "the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury" in committing a lewd act "with the *intent* of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of the defendant or the child. (CALCRIM No. 1111, emphasis added.) It also defines "force," "duress," and how an act is accomplished by "fear."

Soto specifically challenges the following language in CALCRIM No. 1111: "Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or the child is not required." Soto argues this language is argumentative and duplicative because it instructs on facts the prosecution is not obligated to prove and the jury was already instructed on what needed to be proved. Soto also argues the language in question improperly implies that the jury should not consider facts relating to whether he or Jane were sexually aroused, whereas such facts were relevant and could be considered in determining whether he acted with sexual intent.

"In reviewing any claim of instructional error, we must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record. [Citations.] When a claim is made

10

that instructions are deficient, we must determine whether their meaning was objectionable as communicated to the jury. If the meaning of instructions as communicated to the jury was unobjectionable, the instructions cannot be deemed erroneous. [Citations.] The meaning of instructions is . . . [determined under the] test of whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel. [Citations.]" (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

We conclude CALCRIM No. 1111, in its entirety, properly instructed the jury on the applicable law. (*People v. Veale* (2008) 160 Cal.App.4th 40, 51 (*Veale*).) CALCRIM No. 1111 appropriately clarifies that actual sexual arousal is not an element of the offense and therefore proof of it is not required for a section 288 conviction. (§ 288, subd. (b)(1); *People v. McCurdy* (1923) 60 Cal.App.499, 502 ["Whether the acts actually, or in point of fact, have the effect of arousing the passions or sexual desires of the person upon whom they are committed, is immaterial."]; see also *People v. Martinez* (1995) 11 Cal.4th 434, 452 ["[S]ection 288 is violated by 'any touching' of an underage child accomplished with the intent of arousing the sexual desires of either the perpetrator or the child."].) The language in CALCRIM No. 1111 is not constitutionally objectionable.

### III.    *Sufficiency of Evidence*

Soto next contends there was insufficient evidence of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury" to support his convictions for committing forcible lewd acts with a child under 14 (§ 288, subd. (b).) He argues the evidence only supports convictions under section 288, subdivision (a). We disagree.

11

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Subdivisions (b) and (a) of section 288 on their face distinguish "between those lewd acts that are committed by force and those that are not." (*People v. Cicero* (1984) 157 Cal.App.3d 465, 473 (*Cicero*) [disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229].) Section 288, subdivision (a), makes it a felony to "willfully and lewdly" commit "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." Section 288, subdivision (b)(1), proscribes any such conduct committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." "Where a defendant uses physical force to commit a lewd act upon a child under the age of 14, and the child suffers physical harm as a consequence, the defendant has committed a lewd act 'by use of force' under subdivision (b)." (*Cicero*, at p. 484.) However, "[w]here no physical harm to the child has occurred, the prosecution has the burden of proving (1) that the defendant used physical force substantially different from or substantially in excess of that required for the lewd act and (2) that the lewd act was accomplished against the will of the victim." (*Id.* at pp. 484-485.)

Soto cites *People v. Schulz* (1992) 2 Cal.App.4th 999 (*Schulz*), for the proposition the evidence did not show he used force. The court in *Schulz* stated that, "[s]ince ordinary lewd touching often involves some additional physical contact, a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.' " (*Id.* at p. 1004.) The *Schulz* court held that grabbing the victim's arm and holding her while the defendant fondled her did not constitute force sufficient to support a conviction for forcible lewd acts. (*Ibid.*) Nevertheless, the *Schulz* court concluded there was sufficient evidence to support defendant's conviction for violating section 288, subdivision (b), based on duress. The *Schulz* court stated: "In our view duress was involved in this 'nightmare' incident. The victim, then nine years old, was crying while defendant, her adult uncle, restrained and fondled her. On this occasion he took advantage not only of his psychological dominance as an adult authority figure, but also of his physical dominance to overcome her resistance to molestation. This qualifies as duress." (*Id.* at p. 1005.)

Furthermore, courts have rejected the reasoning in *Schulz*, regarding force. (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1004; *People v. Bolander* (1994) 23 Cal.App.4th 155, 159-161; *People v. Neel* (1993) 19 Cal.App.4th 1784, 1789-1790; *People v. Babcock* (1993) 14 Cal.App.4th 383, 387-388 (*Babcock* ).) In *Babcock*, the court found sufficient force where a defendant grabbed the victims' hands and made them touch his genitals, thereby overcoming the victims' attempts to pull away. (*Babcock*, at pp. 386-387.) Similarly, sufficient force was found in *Cicero*, *supra*, 157 Cal.App.3d at page 486, where the defendant picked up two girls by the waist in a

playful but deceitful manner and then placed his hands on their crotches while carrying them away.

Soto also argues there was no evidence of any express or implied threats, such as threats of retribution, violence, restrictions of Jane's privileges or shame or humiliation, to support a finding of duress. Under section 288, subdivision (b)(1), " 'duress' means ' "a direct or implied *threat* of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities" ' " to do or submit to something that person would not otherwise have done or submitted to. (*Veale*, *supra*, 160 Cal.App.4th at p. 46, quoting *People v. Cochran* (2002) 103 Cal.App.4th 8, 13 (*Cochran*).) "[T]hreats need not be express, but may be inferred from conduct. [Citation.] Silent threats, of course, generate fear." (*People v. Reyes* (1984) 153 Cal.App.3d 803, 811.) The victim's age, size, and relationship to the defendant are relevant to a determination of whether the victim's participation has been obtained by duress. (*Cochran*, at pp. 15-16, see also *People v. Pitmon* (1985) 170 Cal.App.3d 38, 51 [finding the evidence sufficient to establish duress, even though the eight-year-old victim testified the defendant did not use force, violence, or threats].)

Here, there was substantial evidence that Jane suffered physical harm after the "big" incident to support that those lewd acts were committed by use of force. (*Cicero*, *supra*, 157 Cal.App.3d at p. 474 ["We presume all would agree that one who inflicts physical harm on a child in the commission of a lewd act is properly convicted of a violation of subdivision (b) 'by use of force.' "].) Jane credibly testified that the lower

14

half of her body was in significant pain, it hurt her to urinate, she could barely sit, and her vaginal area was extremely red, which was corroborated by Kelly.

In addition to the physical harm suffered, Jane's testimony regarding all the incidents was more than sufficient to support a finding of force, as well as duress, under section 288, subdivision (b)(1). Such testimony included that Soto held her up so he could touch her vagina even though Jane kicked to get away, and he forced her legs open when she tried to close them in order to digitally penetrate her vagina. In each incident, Soto picked Jane up and/or positioned her against her will. During the big incident, after he hurt her by an act of anal penetration, Soto flipped Jane over, and then covered her face with a blanket while he orally copulated and penetrated her vagina. These acts of force were substantially different than the molestations themselves.

Finally, as in *Veale*, *supra*, 160 Cal.App.4th at pages 43-44, the molestations took place in the family home, by a trusted adult family member who resided there, when Jane's parents were away. Soto was Jane's "uncle," he was left in charge when he molested her, and Jane's parents were frequently out of town. Soto was taller and stronger than Jane, who was only six years old when the sexual abuse began. She was scared of him when he molested her, and in each incident, he used "physical dominance to overcome her resistance to molestation." (*Schulz*, *supra*, 2 Cal.App.4th at p. 1005.) The evidence was sufficient to support a finding of force, as well as duress, under section 288, subdivision (b)(1).

15

## IV.    *Juror Misconduct*

Soto's final contention on appeal is that the court erred by not holding an evidentiary hearing regarding an allegedly sleeping juror.  This claim is meritless.  During deliberations, the jury foreperson notified the court that one of the jurors had been "falling asleep" during trial.  Defense counsel stated that no inquiry on the matter was needed since he had not observed any sleeping jurors:

> "I would be okay with not even addressing it.  Because it sounds -- it sounds -- I didn't -- I was watching jurors.  They didn't seem to be falling asleep at any point during the trial.  I didn't -- I've seen people fall asleep in court.  It's usually pretty noticeable."

Nonetheless, the trial court questioned the foreperson, who reported that two other jurors had accused the juror in question of falling asleep, but the questioned juror denied it and was participating in the deliberation process.  At that point, counsel for both sides agreed that no further inquiry was needed.  Accordingly, Soto has forfeited his claim of juror misconduct.  (*People v. Williams*, (2013) 58 Cal.4th 197, 289.)  Moreover, under the circumstances and given defense counsel's representations, the court acted well within its discretion in determining that no evidentiary hearing was required.  (*Id.* at p. 289 ["[T]he mere suggestion of juror 'inattention' does not require a formal hearing disrupting the trial of a case."].)

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McINTYRE, Acting P. J.


PRAGER, J.*

---

\*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.