Filed 4/15/16  P. v. Romero CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069673 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI-1303804) |
| RICARDO ROMERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino, William Jefferson Powell IV, Judge.  Affirmed.

Law Office of Christopher Nalls and Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynn G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ricardo Romero began sexually abusing one of his daughters when she was 10 years old. A jury convicted Romero of committing a lewd act on a child under 14 years of age (Pen. Code,[1] § 288, subd. (a)), continuous sexual abuse of a child under 14 years of age (§ 288.5, subd. (a)), and forcible rape of a child over 14 years of age. (§ 261, subd. (a)(2).) The trial court, stating, "[T]he crimes in this case were extraordinarily egregious," sentenced Romero to the aggravated term for each count, with all counts to run consecutively, for a total prison term of 35 years.

On appeal, Romero contends his convictions should be reversed because the court prejudicially erred in admitting expert testimony about child sexual abuse accommodation syndrome. He contends such evidence "should be inadmissible in California for all purposes." As we explain, Romero's argument has already been considered and rejected by existing case law, and our Supreme Court has cited this case law with approval. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 (*McAlpin*); *People v. Brown* (2004) 33 Cal.4th 892, 906 ["'expert testimony on the common reactions of child molestation victims . . . is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in

---

[1] All statutory references are to the Penal Code unless otherwise specified.

reporting—is inconsistent with his or her testimony claiming molestation'"].)

Accordingly, we affirm the judgment.

FACTUAL BACKGROUND

A. *Lewd Act On Then-10-Year-Old A.*

In 2007 Romero lived with his wife and their three children. The oldest child, A., was born in 1996. One morning, when she was 10 years old, A. was lying on her parents' bed. While her mother was making breakfast in the kitchen, Romero entered the room, put his hand under A.'s shirt, and fondled her breasts. A. pretended to be asleep. She did not tell her mother what happened because she was concerned about her mother's ill health and "was scared to tell her."

B. *Continuous Abuse*

About three years later, when A. was 13 years old, Romero entered her bedroom on average of four times each month to sexually abuse her. Romero and his wife had put a locking door knob on A.'s room so she could have privacy. A. would usually lock her door at night when she went to sleep, but Romero used a simple tool to unlock the door.

When Romero entered A.'s room on these occasions, he removed A.'s sleepwear and underwear, either lay down next to her or stood over her, and rubbed her breasts with his hands and inserted his fingers into her vagina. Romero also put his mouth on A.'s breasts and vagina, and he rubbed his penis on her vagina on about four occasions. A. would always pretend to be asleep.

One night when he was in A.'s room, Romero masturbated and after ejaculating in his hand, he inserted his fingers in A.'s vagina. Later, apparently concerned this might

3

have resulted in a pregnancy, he made A. take a home pregnancy test. In another incident, when A. was sleeping on the living room couch, Romero put A.'s hand on his penis, and made her hand move up and down until he ejaculated. She kept her eyes closed and pretended she was asleep.

When A. was 11 or 12 years old, Romero entered her bedroom at night, started rubbing her breasts and vagina with his hands, and got on top of her and began rubbing his penis on her vagina. A.'s brother, who was then about six years old, happened to enter her room. At trial, the brother (now 13 years old) testified that he saw Romero's hands come up from A.'s breasts, and Romero left the room.

C. *Rape*

When A. was 14 years old, Romero unlocked the door to A.'s room, removed her clothes, fondled her breasts, got on top of her with his hips on hers, and tried to insert his penis into her vagina. A. was pretending to be asleep, but when she felt "pressure" and felt Romero's "penis started moving in," she pushed Romero off her and up against the wall of her bedroom. A. was five feet eight inches tall and weighed about 160 pounds at this time. She told Romero to leave her room, and he did.

On another occasion in the same time period, A. woke up when she heard her door being unlocked. A. testified Romero began "the usual routine where he goes under my sheet and my clothes, fondles my breasts, and trying to finger me, takes off my—[s]weats and underwear. And he was trying to have intercourse." A. "felt pressure going inside" and said, "No, dad, I don't want to get pregnant." Romero told A., "[N]o, it is fine, it's okay," and stopped.

4

D. *A. Tells Her Mother*

When A. started high school in 2011, she told her parents she was attracted to females and had a girlfriend. Romero disapproved, and told A. that if she stopped seeing her girlfriend, Romero would stop sexually abusing her. A. agreed.

In April 2012 Romero learned that A. was still seeing her girlfriend. He told A. that because she did not keep her promise, he would not keep his, so he molested her again. Near the end of A.'s freshman year in high school, Romero entered her bedroom early one morning, fondled her breasts, placed her in a kneeling position, and "dry hump[ed]" her.

A few days later, A. told her mother what Romero had been doing. A.'s mother told Romero to leave the family home.

About a week later, Romero returned to the home and met with A. and her mother. Romero admitted touching A.'s breasts and said he had once touched A.'s vagina after masturbating, and that was why he had A. take a pregnancy test. A. became upset because Romero made it appear there had been only that one incident. A. asked him why he was lying, but Romero did not respond. A.'s mother asked Romero if A. was still a virgin, and Romero did not give a clear answer.

In a recorded conversation between Romero and his wife, Romero attempted to dissuade her from contacting the police, offered to give her money, and then agreed to turn himself into the police once she and the children moved.

E. *The Defense*

At the time of trial, A. was 17 years old. In testifying, A. admitted that some of the events "blend together" in her mind and her memory of them "come and go" as she had tried to put some of these incidents out of her memory. She conceded that she was "not clear on what happened during the events [where her] father tried to have intercourse" with her.

On cross-examination, A. testified she did not have a clear memory of her interview with a police detective, had a "hard time getting all the stories straight", and did not have a "clear memory" of certain events. Romero's attorney repeatedly impeached A. with prior inconsistent statements.

A. admitted she had a "hard time" remembering how often her father had sexual contact with her. A. testified she was "having a hard time remembering exactly what happened and when." She explained, "I just been [*sic*] blocking my memories and I try not to think about them, to move on with my life."

Asked why she waited so many years before telling her mother about the sexual abuse, A. testified, "I don't know. I don't know myself that well to know why I waited so long."

From opening statement to closing argument, Romero's defense centered around attacking A.'s credibility. In opening statement, his lawyer told the jury, "All of these statements that she has given have been vague. They have been all over the place. The details have changed. The circumstances have changed." In closing argument, defense counsel repeated the same theme, stating, "[W]hat we have is somebody who cannot keep

6

her stories straight." Defense counsel argued, "She can't keep things straight in her head, can't get her stories straight. She is changing things. . . . It is because she is not telling the truth." Near the end of her closing argument, Romero's lawyer stated that A. "simply was not credible."

DISCUSSION

I. *THE COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING EXPERT TESTIMONY CONCERNING CHILD SEXUAL ABUSE ACCOMODATION SYNDOME*

A. *The Expert Testimony*

Most jurors, fortunately, have been spared the experience of being victims of child sexual abuse. Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial. It is reasonable to conclude that on the basis of their intuition alone many jurors would not believe that a normal, truthful child would tolerate sexual abuse and incest without immediately and accurately reporting the event. It would be natural for a jury to wonder why the sexual abuse was not immediately reported if it had really occurred. (See *McAlpin*, *supra,* 53 Cal.3d at p. 1302.)

Over defense counsel's objection, psychologist Jody Ward testified as an expert witness on child sexual abuse accommodation syndrome (CSAAS). CSAAS evidence allows the jury to consider inconsistencies and other behaviors that appear to show deceit as behavior explainable by other reasons. CSAAS explains how certain behaviors in children who have been sexually abused (such as delay in reporting, or inconsistencies in events reported) can be understood by reasons other than deceit. In this way, CSAAS

7

evidence may help to dispel common myths about how child victims would be expected to respond to sexual abuse.

As Ward explained, CSAAS "is a pattern of behaviors that many children exhibit who have been sexually abused." Specifically, CSAAS "helps us as therapists or lay people to understand why children do what they do in response to sexual abuse" and was developed based on observations of behaviors by victims of child sexual abuse by a number of professionals over a period of time. Ward explained the five facets of CSAAS are secrecy, helplessness, entrapment and accommodation, delayed unconvincing disclosure, and recantation or retraction.

Ward testified that CSAAS is sometimes helpful in understanding why (1) children do not disclose sexual abuse for long periods of time; (2) children will go along with the sexual abuse; (3) it is not uncommon for a child to be confused about when certain acts of abuse occurred; and (4) a child will not disclose all the details or events all at once, but rather will disclose new events even years after disclosing the initial sexual abuse.

Ward testified that children tend to keep the secret of sexual abuse for long periods of time. Because of the "shame involved in sexual abuse and even because young children seem to know there is something wrong . . . they have their own sense of shame about it and they keep the secret . . . ."

Ward also testified that long-delayed reporting occurs because of how children cope with sexual abuse. She explained:

"A lot of times we see children acquiescing and going along with the sexual abuse, putting themselves in situations over and over again to be sexually abused. And those of us on the outside look at that and go why would a child continue to put themselves in that situation if they know they are going to be sexually abused? Well, what we don't realize is this child may have decided that, well, I have to put up with this very negative aspect of sexual abuse in order to receive the positive aspects of the relationship. . . . [¶] So the entrapment and accommodation refers to how a child learns to cope with sexual abuse with the very negative aspect of sexual abuse that could be going on in an otherwise positive relationship."

Ward also testified it is "not uncommon for a child to be confused when certain acts of abuse occur" and to forget or omit "details."

Ward unequivocally stated she was *not* testifying Romero was guilty and was not testifying that A. was telling the truth. Ward testified she had never met A. and knew nothing about this case:

"Q: Dr. Ward, let's talk about why you are not here. You are not here today to tell the jury that the defendant is guilty, is that right?

"A: That's correct.

"Q: And you are not here today to tell the jury that the victim is telling the truth?

"A: That's correct."

Ward also testified that CSAAS is not a diagnostic tool and cannot be used to determine if sexual abuse occurred:

"Q: This is not a tool that is used to say, all right, the child experienced 1, 2, 3, and 4, they must have been molested.

"A: That's correct.

"Q: That's not what it is used for. [¶] . . .

9

"A:  Yes, your statement was correct."

Ward emphasized "it is improper to take behaviors afterward and try to diagnose whether or not sexual abuse occurred. . . .  [W]e just don't know."  She added, "I use it [CSAAS] in just understanding how children respond to sexual abuse, how they normally report sexual abuse . . . .  [¶] But, no, I never take any kind of behavior that a child has exhibited later and try to diagnose whether sexual abuse occurred.  That is unethical and I do not do it."

B.  *The Court Did Not Abuse Its Discretion in Allowing CSAAS Testimony*

Romero contends "CSAAS evidence should be inadmissible in California for all purposes."  He asserts the "premise that jurors believe certain myths, such as that child victims of sexual abuse invariably give prompt, consistent, precise reports has not been shown to be valid" and CSAAS evidence "cannot possibly be limited to the description of myths surrounding abuse; jurors will inevitably and invariably use it in an improper manner."  He urges us to follow the rule in Pennsylvania, Kentucky, and Tennessee where, purportedly, "CSAAS evidence is inadmissible for all purposes."

Evidence Code section 801, subdivision (a) permits the introduction of testimony by a qualified expert when that testimony is related to a subject that is sufficiently beyond common experience that the opinion of the expert would assist the trier of fact.  "'[T]he admissibility of expert opinion is a question of degree.  The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard.  Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted

10

whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness."'" (*McAlpin, supra,* 53 Cal.3d at pp. 1299-1300.) We review a trial court's decision to admit expert testimony for abuse of discretion. (*Id.* at p. 1299.)

In arguing that CSAAS evidence should be excluded for all purposes, Romero is presenting an argument that has already been considered and rejected by existing case law. Numerous California courts have held CSAAS evidence is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse. (See, e.g., *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116-117; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394 (*Bowker*).)

Significantly, our Supreme Court has cited this case law with approval, stating that in cases of alleged child sexual abuse, "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such

11

expert rebuttal testimony.'" (*McAlpin*, *supra,* 53 Cal.3d at pp. 1300-1301, fn. omitted.) More recently, in *People v. Brown*, *supra,* 33 Cal.4th at pages 906-907, our Supreme Court stated that expert testimony on CSAAS was similar to expert testimony on the behavior of domestic violence victims and, on that basis among others, concluded that the expert testimony on the behavior of domestic violence victims was admissible in cases involving domestic violence.

Here, Romero's defense centered around raising inferences that A.'s delay in reporting the sexual abuse and inconsistencies in what she has told others about the abuse indicate she is not credible. The primary purpose of CSAAS testimony was to show why the victim acted as she did. The testimony was introduced to explain the state of mind of the complaining witness. (*Patino*, *supra,* 26 Cal.App.4th at p. 1746.) The CSAAS evidence explains the emotional reasons for an abused child's delay in reporting and prior inconsistent statements, and thus tends to rehabilitate the witness, assuming, of course, the jury concludes from other evidence the witness was in fact abused.

"CSAAS assumes a molestation has occurred and seeks to describe and explain common reactions of children to the experience. [Citation]. The evidence is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Bowker, supra,* 203 Cal.App.3d at p. 394, italics omitted.)

Ward's testimony concerning secrecy, delayed reporting, and inconsistencies in reporting events as being common in child abuse victims was admissible—not to prove Romero sexually abused A.—but to disabuse jurors of any misconception that a child's

12

delay in reporting or confusion and confabulation of certain events necessarily means the events are fabricated. The CSAAS evidence allowed the jury to consider the delay and inconsistencies that may show deceit as explainable by other reasons. In this way, the jury was given two explanations for the same behaviors (deceit v. no deceit) and in a more informed manner could determine the truth.

Moreover, the court instructed the jury with CALCRIM No. 1193 as follows:

"You have heard testimony from Dr. Jody Ward regarding child sexual abuse accommodation syndrome. Dr. Ward['s] testimony about . . . child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [A.'s] conduct was not inconsistent with the conduct of someone who has been molested and in examining the believability of her testimony."

This is a correct statement of the law, and Romero points to nothing in the record that undermines our confidence the jury followed this instruction in reaching its verdict. (See generally *People v. Holt* (1997) 15 Cal.4th 619, 662 [jurors are presumed to understand and follow the trial court's instructions].) Accordingly, we reject Romero's unsupported assertion the jury would "inevitably and invariably" use CSAAS evidence for an improper purpose.

Relying on case law in other jurisdictions, Romero argues that the California position on CSAAS evidence should be reexamined. Romero cites *Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830, 838 (*Dunkle*), *Newkirk v. Commonwealth* (Ky. 1996) 937 S.W.2d 690, 691-694, and *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557. We decline to do so. To the extent our Supreme Court has approved the admissibility of

13

CSAAS evidence to rebut misconceptions about the behavior of child sexual abuse victims, we are required to follow that precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, Romero fails to acknowledge that approximately 20 other out-of-state jurisdictions have held CSAAS-type evidence to be admissible in explaining common behavioral traits of sexually abused children. (Annot., Admissibility of Expert Testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) in Criminal Case (2001) 85 A.L.R.5th 595, 612-614.)[2]

On this record we are satisfied the CSAAS testimony was properly used to dispel certain common misconceptions regarding the behavior of child sexual abuse victims and therefore the trial court did not abuse its discretion in allowing the testimony. (See *People v. Housley*, *supra,* 6 Cal.App.4th at pp. 955-956.)

## DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.

---

2    Additionally, in 2012 Pennsylvania enacted legislation allowing expert testimony that will assist the trier of fact in understanding "victim responses to sexual violence." As discussed in *Commonwealth v. Carter* (Pa.Super.Ct. 2015) 111 A.3d 1221, 1224, the contrary rule in *Dunkle* that Romero cites has been superseded by this statute.

14