Filed 1/28/21  P. v. Valsecchi CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARCOS VALSECCHI,<br><br>        Defendant and Appellant. | A157683<br><br>(Napa County Super. Ct.<br>No. 18CR000967) |

Defendant Marcos Valsecchi was convicted of felony false imprisonment after a physical struggle with his ex-wife and sentenced to three years probation.  Valsecchi argues that certain expert testimony was improperly admitted, that the trial court should have sua sponte instructed the jury on intimate partner battering, that substantial evidence does not support his conviction, that a probation condition allowing warrantless searches of his person and property is invalid, and that he is entitled to the benefit of recently passed legislation limiting his term of probation to two years.  We agree that Valsecchi's probation term must be reduced to two years, and otherwise affirm.

**BACKGROUND**

Valsecchi and Erin R. were married in 2012 and had a daughter, A.V., in September of that year.  After they separated in 2014, Erin R. and Valsecchi went to mediation and ultimately agreed to joint custody of A.V.

1

Under their custody arrangement, A.V. primarily lived with Erin R., who was staying with her parents in Napa. A.V. would have visits with her father every other weekend, beginning on Thursday evening and ending on Sunday.

In 2016, Valsecchi began keeping A.V. through Sunday night, dropping her off at preschool on Monday morning. Erin R. felt this was a violation of the custody agreement, which made her feel "powerless and frustrated."

At about 3:00 p.m. on Thursday, November 3, 2016, Erin R. and Valsecchi had a meeting with A.V.'s teacher. A.V. would have normally gone directly from school to visit her father, but Erin R. told Valsecchi that she would not allow A.V. to visit him that weekend because he had not been returning her on Sundays. Erin R. then returned home.

Soon afterward, Valsecchi arrived at Erin R.'s parents' house, pounded on the door, and called for Erin R. and his daughter. Erin R. opened the door; Valsecchi was "emotional" and "upset" and began to enter the house. After the door opened, Valsecchi pushed Erin R. against the wall. The two then "struggled for a bit," Erin R. "kind of los[t her] balance," "g[o]t pushed into the chair that's in the foyer," and was unable to stand up for a brief time. Eventually, Erin R. grabbed Valsecchi by the hair and was able to get him outside the house. Erin R. and Valsecchi then sat on the stairs, were able to calm down, and had a conversation. Valsecchi ultimately took A.V. for the weekend. Later that evening, Erin R. called the police and reported the incident.

On August 30, 2018, the Napa County District Attorney filed an information charging Valsecchi with felony false imprisonment by violence

(Pen. Code, § 236)[1] (count 1) and misdemeanor domestic violence battery (§ 243, subd. (e)(1)) (count 2).

A jury trial took place in May of 2019. Erin R., her mother, Napa Police Officer Darlene Elia, and Melissa Kelly, an investigator with the Napa County District Attorney's office, testified for the prosecution. Valsecchi testified in his own defense.

Before instructing the jury, the trial court dismissed count 2, concluding it was barred by the statute of limitations. The trial court also found that the lesser-included offense on count 1 of misdemeanor false imprisonment was barred by the statute of limitations, and accordingly the jury was not instructed on that offense. After deliberating briefly, the jury found Valsecchi guilty. The trial court suspended imposition of sentence and placed Valsecchi on three years formal probation.

Valsecchi appeals.

## DISCUSSION

Valsecchi argues that (1) the trial court erred in admitting the expert testimony of Investigator Kelly regarding domestic violence, (2) the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 850 regarding intimate partner battering, (3) the evidence was insufficient to support the felony false imprisonment conviction, and (4) the warrantless search probation condition is invalid under *People v. Lent* (1975) 15 Cal.3d 481 (*Lent*). In a supplemental brief, he further argues that the length of this probation term should be reduced to two years under recently passed legislation.

---

[1] Further undesignated statutory references are to the Penal Code.

## I. *The Trial Court Did Not Err in Admitting the Testimony of Inspector Melissa Kelly*

Valsecchi's first argument is that the trial court erred in admitting the testimony of Napa County District Attorney's Office Investigator Melissa Kelly, who testified regarding intimate partner battering and its effects.

Inspector Kelly testified briefly—aside from discussing her career history and qualifications, her testimony spans approximately 10 pages in the transcript. She testified generally regarding "misunderstandings" in domestic violence cases, explaining why victims delay reporting incidents of domestic violence, and the behavior of "recanting" and "minimizing," where victims "take[] back their story or parts of their story about what happened" and "minimize the event." She also testified regarding intimidation, emotional abuse, threats, and economic abuse as tools abusers use to exert control over their victims. At the conclusion of her direct examination, Kelly explained that she had never met Erin R. and had not done any work on Valsecchi's case.

Valsecchi argues that this testimony should not have been admitted under Evidence Code section 1107 and that its probative value was outweighed by prejudice under Evidence Code section 352[2], evidentiary rulings we review for abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

Evidence Code section 801, subdivision (a), permits the introduction of testimony by a qualified expert when that testimony may "assist the trier of

---

[2] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

4

fact." And Evidence Code section 1107, subdivision (a) provides: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

In *People v. Brown* (2004) 33 Cal.4th 892, 906, our Supreme Court held that expert testimony regarding domestic violence was properly admitted under Evidence Code section 801, even where there was evidence of only a single incident of physical violence between the defendant and the victim, because it would assist the trier of fact in evaluating the credibility of the victim's trial testimony "by providing relevant information about the tendency of victims of domestic violence later to recant or minimize their description of that violence" (*id.* at p. 896), going on to explain: "When the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the jurors may well assume that the victim is an untruthful or unreliable witness. [Citations.] And when the victim's trial testimony supports the defendant or minimizes the violence of his actions, the jurors may assume that if there really had been abusive behavior, the victim would not be testifying in the defendant's favor." (*Id.* at p. 906; see *id.* at pp. 904–908.) Indeed, as the Supreme Court later put it, "[e]ven if the defendant never expressly contests the witness's credibility along these lines, there is nothing preventing the jury from ultimately finding in its deliberations that the witness was not credible, based on misconceptions that could have been dispelled by [intimate partner battering] evidence." (*People v. Riggs* (2008) 44 Cal.4th 248, 293.)

Valsecchi argues that Inspector Kelly's testimony was not admissible under Evidence Code section 1107 because this was an "isolated incident" and thus the facts are distinguishable from *Brown*, where "evidence presented at trial suggested the possibility that defendant and [the victim] were in a 'cycle of violence' of the type described by expert." (*Brown*, *supra*, 33 Cal.4th at p. 907.) But the testimony held admissible in *Brown* explained that the cycle of violence "does not necessarily begin with physical abuse," but rather "with a struggle for power and control between the abuser and the victim that later escalates to physical abuse." (*Ibid.*) And here the prosecution argued that Valsecchi's conflict with Erin R. regarding returning A.V. from his visits was just such a struggle. In addition, as discussed, Inspector Kelly's testimony was relevant to the jury's evaluation of Erin R.'s credibility. (*People v. Brown*, *supra*, 33 Cal.4th at p. 906.) Accordingly, there was no abuse of discretion in admitting Inspector Kelly's testimony under Evidence Code section 1107. For the same reasons, Valsecchi's argument that the testimony should have been excluded under Evidence Code section 352 also fails.

## II.  *The Trial Court Did Not Have a Sua Sponte Duty to Instruct the Jury with CALCRIM 850 Regarding Intimate Partner Battering*

Valsecchi next argues that the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 850, which in this case would have provided: "You have heard testimony from [Investigator Kelly] regarding the effect of (battered women's syndrome/intimate partner battering.) [¶] [Investigator Kelly's] testimony about (battered women's syndrome/intimate partner battering) is not evidence that the defendant committed any of the crimes charged against [him] . . . . [¶] You may consider this evidence only in deciding whether or not [Erin R.'s] conduct was not inconsistent with the

6

conduct of someone who has been abused, and in evaluating the believability of [her] testimony." Valsecchi relies on our decision in *People v. Housley* (1992) 6 Cal.App.4th 947, where we held that the trial court has a sua sponte duty to provide a similar limiting instruction when the jury hears evidence about child sexual abuse accommodation syndrome. (*Id.* at pp. 956–959.)

Assuming without deciding that the trial court erred in failing to sua sponte provide a limiting instruction regarding Investigator Kelly's testimony, we conclude that the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836, because Valsecchi cannot establish a reasonable probability of a more favorable result if the instruction had been given. Investigator Kelly testified about domestic violence victims as a class, based on her general experience working on domestic violence cases. (See *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1074 ["Where, as here, the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence"]; *People v. Housley*, *supra*, 6 Cal.App.4th at p. 959 [error harmless where "testimony was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim"]; *People v. Stark* (1989) 213 Cal.App.3d 107, 115–116.) Inspector Kelly also testified she had not worked on Valsecchi's case and had never met with Erin R. (See *People v. Mateo*, *supra*, 243 Cal.App.4th at p. 1074; *People v. Housley*, *supra*, 6 Cal.App.4th at p. 959.) And the trial court later instructed the jury that with respect to expert opinion, it "must consider the opinion but you are not required to accept it as true or correct. The meaning and importance of any opinion are for you to decide. . . . You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable[,] or unsupported by the

evidence." (See *People v. Mateo, supra*, 243 Cal.App.4th at p. 1074.) Under these circumstances, we conclude that Valsecchi has failed to demonstrate prejudice from the claimed instructional error.

## III. *Substantial Evidence Supports Valsecchi's Conviction for Felony False Imprisonment*

Valsecchi next argues that there was not substantial evidence to support his conviction for felony false imprisonment, in particular, insufficient evidence of physical force greater than necessary to restrain Erin R.

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) False imprisonment is punishable as a felony where it is "effected by violence, menace, fraud, or deceit." (§ 237, subd. (a).) As the commentary for CALCRIM No. 1240 explains, "[f]orce is required for a finding of both misdemeanor and felony false imprisonment, while violence is only required for the felony." And "[v]iolence means using physical force that is greater than the force reasonably necessary to restrain someone." (CALCRIM No. 1240; see *People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1462.)

"When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970.) Substantial evidence is "evidence that is reasonable, credible, and of solid value—such that a

8

reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Catley* (2007) 148 Cal.App.4th 500, 504.)

We conclude that substantial evidence supports the jury's determination that Valsecchi used the "violence" necessary for a felony false imprisonment conviction. In particular, Erin R. testified that at the time Valsecchi pushed her into the chair, he also "grabbed" or "squeezed" her breast, hard enough that it was sore for a day and night afterwards. Erin R.'s mother testified that the day after the incident, Erin R. had a bruise on her right cheek, and that Erin R. told her the bruise was from Valsecchi "grabbing her face."[3] This evidence was sufficient to permit the jury to conclude that Valsecchi had used force "greater than reasonably necessary" to restrain Erin R. in the chair so as to support a conviction for felony false imprisonment.[4]

*People v. Hendrix, supra*, 8 Cal.App.4th 1458, relied on by Valsecchi, is unavailing. In that case, the defendant allegedly grabbed the victim from behind, put his hand on her neck, pushed her onto the bed and started to choke her. (*Id.* at p. 1460.) He then pinned her down using his upper body and used his knee to force her legs apart. (*Ibid.*) The trial court refused to instruct the jury on misdemeanor false imprisonment, apparently based on the erroneous assumption that force was solely an element of felony false imprisonment. (*Id.* at p. 1462.) The Court of Appeal reversed, holding that

---

[3] When Erin R. herself was asked about the bruise, she denied having a bruise on her face, and later testified that she did not "recall" a bruise.

[4] Because we conclude that the felony false imprisonment conviction is supported by substantial evidence that Valsecchi restrained Erin R. in the chair, we need not reach his arguments that he did not use more force than necessary to restrain her against the wall.

9

the legal basis for the refusal was erroneous and that the error was prejudicial because there the jury could have concluded from the evidence that the defendant did not use violence. (*Id*. at p. 1463.) But the court did not consider or address whether the evidence was sufficient to support a conviction of felony false imprisonment, the issue before us here.

Valsecchi also relies on *People v. Matian* (1995) 35 Cal.App.4th 480 (*Matian*), where the defendant was convicted of felony false imprisonment after he "squeezed [the victim's] breast sufficiently hard to cause her pain, and possibly even bruising," and "grabbed her arm and yelled at her not to go." (*Id*. at p. 485.) On appeal, the Attorney General "tacitly agree[d]" that the evidence was insufficient to show "violence" by arguing instead that other evidence demonstrated "menace"—and the *Matian* court did not discuss the "violence" element of felony false imprisonment further. (*Ibid*.) As Valsecchi acknowledges, *Matian* has been repeatedly criticized. (See, e.g., *People v. Islas* (2012) 210 Cal.App.4th 116, 125–126; *People v. Wardell* (2008) 162 Cal.App.4th 1484, 1490–1491; *People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1513; *People v. Castro* (2006) 138 Cal.App.4th 137, 143 ["We have no problem with concluding the evidence addressed in the published portion of the opinion [in *Matian*] supported the conviction for felony false imprisonment by menace, if not violence"].) To the extent *Matian* holds that the evidence in that case was insufficient to establish "violence," we will decline to follow it here.

IV. ***The Warrantless Search Condition Is Reasonable Under* Lent**

At sentencing, the trial court imposed the following probation condition over defense counsel's objection: "Submit your person, residence, vehicle and property to search and seizure by a Probation Officer or any law enforcement officer, at any time of the day or night, with or without a warrant, and with

10

or without reasonable suspicion." Valsecchi contends that this condition is invalid under *People v. Lent*, *supra*, 15 Cal.3d 481.

" 'The primary goal of probation is to ensure "[t]he safety of the public . . . through the enforcement of court-ordered conditions of probation." (§ 1202.7.)' (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120 (*Carbajal*).) Accordingly, the Legislature has empowered the court, in making a probation determination, to impose any 'reasonable conditions, as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer . . . .' (§ 1203.1, subd. (j).)" (*People v. Olguin* (2008) 45 Cal.4th 375, 379 (*Olguin*).)

"Generally, '[a] condition of probation will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . ." [Citation.]' (*Lent*, *supra*, 15 Cal.3d at p. 486.) This test is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term. (*Id.* at p. 486, fn. 1; see also *People v. Balestra* (1999) 76 Cal.App.4th 57, 68–69 (*Balestra*).) As such, even if a condition of probation has no relationship to the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality. (See *Carbajal*, *supra*, 10 Cal.4th at [p.] 1121.)" (*Olguin*, *supra*, 45 Cal.4th at pp. 379–380.)

Probation conditions are subject to an abuse of discretion standard of review. (*People v. Appleton* (2016) 245 Cal.App.4th 717, 723.)

11

In *Balestra, supra,* 76 Cal.App.4th 57, the court upheld a search condition as applied to a defendant convicted of elder abuse, even though the condition was not related to the underlying offense, explaining that "a warrantless search condition is intended to ensure that the subject thereof is obeying the fundamental condition of all grants of probation, that is, the usual requirement (as here) that a probationer 'obey all laws,' " and that such a condition is "necessarily justified by its rehabilitative purpose." (*Id.* at p. 67.) And in *Olguin, supra,* 45 Cal.4th 375, our Supreme Court cited *Balestra* approvingly for the proposition that "probation conditions authorizing searches 'aid in deterring further offenses . . . and in monitoring compliance with the terms of probation.' " (*Id.* at p. 380.)

The same justification applies here. Valsecchi's terms of probation include a requirement that he "not own or possess any firearm, ammunition or other dangerous weapon," and that he "[o]bey all laws." (See *Balestra, supra,* 76 Cal.App.4th at p. 67.) The search condition will serve to help Valsecchi's probation officer ensure that he is complying with those terms of his probation.[5]

---

[5] Valsecchi's reliance on *In re Martinez* (1978) 86 Cal.App.3d 577 (*Martinez*) is misplaced. In *Martinez,* the defendant pled guilty to misdemeanor battery on a police officer after he threw a beer bottle at a police car, and challenged a probation condition requiring him to submit to warrantless searches. (*Id.* at p. 579.) *Martinez* invalidated the condition under *Lent*'s third prong, concluding that "[t]here must be a factual 'nexus' between the crime, defendant's manifested propensities, and the probation condition," relying heavily on *People v. Keller* (1978) 76 Cal.App.3d 827 (*Keller*). (*Martinez, supra,* 86 Cal.App.3d at p. 583.) But *Keller* has since been disapproved by the court that wrote it, finding it went "far beyond the *Lent* test" and was inconsistent with subsequent Fourth Amendment jurisprudence. (*Balestra, supra,* 76 Cal.App.4th at pp. 66–67.) The *Martinez* court's emphasis on a "factual 'nexus' " to the offense is also undermined by our Supreme Court's subsequent statement in *In re Ricardo P.* that

12

*In re Ricardo P.*, *supra*, 7 Cal.5th 1113 does not change our conclusion. There, our Supreme Court held that a probation condition that allowed warrantless searches of a minor's electronic devices was invalid under *Lent*'s third prong because, "on the record before [it], the burden it impose[d] on [the minor's] privacy [was] substantially disproportionate to the countervailing interests of furthering his rehabilitation and protecting society." (*Ricardo P.*, *supra*, 7 Cal.5th at p. 1119.) In doing so, the Supreme Court emphasized the "sweeping" nature of the condition, which required the minor to "submit all of his electronic devices and passwords to search at any time," observing that it "significantly burdens privacy interests" and was "burdensome and intrusive," and therefore "requires a correspondingly substantial and particularized justification." (*Id.* at pp. 1122–1123, 1126.) And in response to the Attorney General's argument that "invalidating the electronics search condition here would make it impossible for courts to impose 'common' and 'standard search conditions,' such as those permitting warrantless searches of a juvenile probationer's person, property, and residence," *Ricardo P.* went on: "But a property or residence search condition is likewise subject to *Lent*'s three-part test. Under the rule we set forth today, a juvenile court imposing such a condition must consider whether, in light of 'the facts and circumstances in each case' [citation], the burdens imposed by the condition are proportional to achieving some legitimate end of probation. Our

"[r]equiring a nexus between the condition and the underlying offense would essentially fold *Lent*'s third prong into its first prong. We have said that 'conditions of probation aimed at rehabilitating the offender need not be so strictly tied to the offender's precise crime' ([*People v.*] *Moran* [(2016)] 1 Cal.5th [398,] 404–405) so long as they are 'reasonably directed at curbing [the defendant's] future criminality' (*id.* at p. 404)." (*In re Ricardo P.* (2019) 7 Cal.5th 1113, 1122 (*Ricardo P.*).)

13

determination that the electronics search condition here is not reasonably related to Ricardo's future criminality will not impair juvenile courts' ability to impose traditional search conditions in future cases when warranted. [¶] Moreover, the Attorney General's argument does not sufficiently take into account the potentially greater breadth of searches of electronic devices compared to traditional property or residence searches. [Citation.]" (*Id.* at p. 1127.)

We find *Ricardo P.* distinguishable for two reasons. First, the traditional search condition imposed here is far less "burdensome and intrusive" than the wide-ranging electronic search condition imposed in that case, and thus requires a less "substantial and particularized justification." (*Ricardo P.*, *supra*, 7 Cal.5th at p. 1126.) And as discussed, the search condition imposed here is "proportional to achieving some legitimate end of probation" (*id.* at p. 1127), namely, determining whether Valsecchi is complying with the terms of his probation forbidding him from possessing weapons and requiring that he "[o]bey all laws." For these reasons, the trial court did not abuse its discretion in imposing the search condition.

## V. *New Legislation Limiting Length of Valsecchi's Probation Term Applies Retroactively*

When Valsecchi was sentenced, section 1203.1 provided that a trial court may grant felony probation "for a period of time not exceeding the maximum possible term of the sentence[.]" If the "maximum possible term of the sentence is five years or less, then the period of suspension of imposition or execution of sentence may, in the discretion of the court, continue for not over five years." (Former § 1203.1, subd. (a).) The trial court here granted probation for three years.

Effective January 1, 2021, Assembly Bill No. 1950 (AB 1950) amended section 1203.1, subdivision (a) to limit the probation term for felony offenses to two years, except in cases of certain violent felonies.  (Stats. 2020, ch. 328, § 2; § 1203.1, subds. (a), (m).)  In a supplemental brief, Valsecchi argues that he is entitled to the retroactive benefit of this legislation under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).  The Attorney General argues that AB 1950 does not have retroactive effect because probation is not "punishment" within the meaning of *Estrada*.  We agree with Valsecchi.

Under *Estrada*, "a limited rule of retroactivity . . . applies to newly enacted criminal statutes intended to reduce punishment for a class of offenders.  [¶]  Under such circumstances, we presume that newly enacted legislation mitigating criminal punishment reflects a determination that the 'former penalty was too severe' and that the ameliorative changes are intended to 'apply to every case to which it constitutionally could apply,' which would include those 'acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.'  (*Estrada*, *supra*, 63 Cal.2d at p. 745.)  The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' (*People v. Conley* (2016) 63 Cal.4th 646, 657, citing *Estrada*, at p. 745.)  'The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses.' [Citations.]" (*People v. Buycks* (2018) 5 Cal.5th 857, 881–882.)

In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, our Supreme Court considered the retroactive effect of Proposition 57, which prohibits prosecutors from charging juveniles with crimes directly in adult court, requiring them instead to commence the action in juvenile court and seek a "transfer hearing" for the juvenile court to determine whether the matter should be transferred to adult court. (*Id*. at p. 303; see Welf. & Inst. Code, § 707, subd. (a).) *Lara* concluded that "Proposition 57 is an 'ameliorative change[ ] to the criminal law' that we infer the legislative body intended 'to extend as broadly as possible.' " (*Lara*, at p. 309.) And *Lara* went on to cite with approval *People v. Vela* (2017) 11 Cal.App.5th 68 (*Vela*), review granted July 12, 2017, S242298, which had reached the same conclusion: " 'Here, for a minor accused of a crime, it is a potential "ameliorating benefit" to have a neutral judge, rather than a district attorney, determine that he or she is unfit for rehabilitation within the juvenile justice system. . . . And the impact of the decision to prosecute a minor in criminal court rather than juvenile court can spell the difference between a 16-year-old minor such as Vela being sentenced to prison for 72 years to life, or a discharge from the DJJ's custody at a maximum of 23 years of age.' " (*Lara*, *supra*, 4 Cal.5th at p. 308; citing *Vela*, *supra*, 11 Cal.App.5th at pp. 77–78.)

More recently, in *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*) our Supreme Court considered the application of *Estrada* to the enactment of sections 1001.35 and 1101.36, which created a pretrial diversion program for certain defendants with mental health disorders:

"The pertinent circumstances here are like those involved in *Lara*, in that the possibility of being granted mental health diversion rather than being tried and sentenced 'can result in dramatically different and more lenient treatment.' (*Lara*, *supra*, 4 Cal.5th at p. 303.) A defendant who

16

shows that he or she is eligible and suitable for diversion may be referred to a mental health treatment program designed to meet the defendant's specialized needs for up to two years. (§ 1001.36, subd. (c)(1).) If a defendant successfully completes diversion, the trial court 'shall' dismiss the criminal charges and the 'arrest upon which the diversion was based shall be deemed never to have occurred.' (*Id.*, subd. (e).) Accordingly, the impact of a trial court's decision to grant diversion can spell the difference between, on the one hand, a defendant receiving specialized mental health treatment, possibly avoiding criminal prosecution altogether, and even maintaining a clean record, and on the other, a defendant serving a lengthy prison sentence. (See *Lara*, *supra*, 4 Cal.5th at p. 308.) Indeed, the People concede in their briefing that 'mental health diversion has a potentially ameliorative effect: defendants who successfully complete the program would be able to have criminal charges wiped clean.' Thus, the ameliorative nature of the diversion program places it squarely within the spirit of the *Estrada* rule." (*People v. Frahs*, *supra*, 9 Cal.5th at p. 631.)

Like these cases, we conclude that a reduction in the length of a term of probation is likewise an "ameliorative change[] to the criminal law" such that *Estrada*'s presumption of retroactivity applies. (*Lara*, *supra*, 4 Cal.5th at p. 308, citing *People v. Conley*, *supra*, 63 Cal.4th at p. 657.)

In *People v. Burton* (Nov. 9, 2020, No. BR 054562) 58 Cal.App.5th Supp. 1 (*Burton*), the Appellate Division of the Los Angeles Superior Court held that AB 1950's limit on the maximum length of probation terms for misdemeanor offenses to one year has retroactive effect under *Estrada*, *id*. at pp. 7–10, with this comprehensive analysis:

"It is unquestionable the reduction of the maximum amount of time a person may be placed on probation from three years (or more), to one year,

inures greatly to the benefit of many persons subject to supervision. At any time a person is on probation, the court has the authority to revoke probation and sentence the person to jail, and a probation violation may even be based on violating court rules that do not amount to new crimes. (See Pen. Code, § 1203.2, subds. (a) & (c).) The longer a person is on probation, the potential for the person to be incarcerated due to a violation increases accordingly. The possibility of incarceration due to being on probation for periods longer than a year based on minor probation violations was relied on by the Legislature in enacting the provision lowering the maximum probationary period. (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1950 (2019–2020 Reg. Sess.) as amended May 6, 2020, p. 5 ['If the fact that an individual is on probation can increase the likelihood that they will be taken back into custody for a probation violation that does not necessarily involve new criminal conduct, then shortening the period of supervision is a potential avenue to decrease individuals' involvement in the criminal justice system for minor infractions'].)

"Moreover, while a person is on probation, the individual may lawfully be ordered to comply with numerous and varied conditions, including, as in this case, ordering the person to provide prosecutors a list of properties they own. In other situations, they may be subject to search and seizure by law enforcement with or without a warrant (see *People v. Robles* (2000) 23 Cal.4th 789, 795), submitting urine samples for narcotics use monitoring (see *People v. Beagle* (2004) 125 Cal.App.4th 415, 419), and regularly interrupting persons' work and schooling and traveling to court for progress reports. In addition, when a court's orders are violated, courts have power to increase a probationer's supervision and intensify restrictions by modifying probation conditions. (Pen. Code, § 1203.3, subd. (a).) The longer the length

18

of probation, the greater the encroachment on a probationer's interest in living free from government intrusion. The concern that, in practice, probation can have punitive effects was also relied on by the Legislature in enacting the new law. (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1950 (2019–2020 Reg. Sess.) as amended May 6, 2020, p. 5 [noting studies 'argue that rather than being rehabilitative, the experience of probation can actually increase the probability of future incarceration . . . . Scholars argue that the enhanced restrictions and monitoring of probation set probationers up to fail, with mandatory meetings, home visits, regular drug testing, and program compliance incompatible with the instability of probationers' everyday lives'].)

"It has been noted, a '[g]rant of probation is, of course, qualitatively different from such traditional forms of punishment as fines or imprisonment. Probation is neither "punishment" [citation] nor a criminal "judgment" [citation]. Instead, courts deem probation an act of clemency in lieu of punishment [citations], and its primary purpose is rehabilitative in nature [citation].' (*People v. Howard* (1997) 16 Cal.4th 1081, 1092 [probation is not a form of punishment for purposes of applying the rule that a trial court's jurisdiction to modify a sentence continues after sentence is pronounced and entered in the court minutes, until the time the court issues and delivers a commitment document to prison authorities]; see also *People v. Benitez* (2005) 127 Cal.App.4th 1274, 1278 [no right to jury trial on facts rendering a person ineligible for probation because *Apprendi v. New Jersey* (2000) 530 U.S. 466 applies only to facts that increase punishment]; *People v. Lofink* (1988) 206 Cal.App.3d 161, 168 [probation not 'punishment' for purposes of the bar to multiple punishment in Pen. Code, § 654]; *People v. Gilchrist* (1982) 133 Cal.App.3d 38, 47–48 [persons supervised on probation

19

not similarly situated as persons serving a prison sentence for purposes of equal protection analysis as '[p]robation is not a form of punishment'].)

"But, although probation is not considered 'punishment' for specified purposes, the presumption of legislative intent in *Estrada* is not confined to only situations when jail and prison sentences are directly decreased due to new laws. A court may presume an intent to broadly apply laws even when they 'merely [make] a reduced punishment *possible*.' (*People v. Frahs*, *supra*, 9 Cal.5th at p. 629.) The Legislature in this instance clearly contemplated that reducing the amount of time probation can last was significantly beneficial to persons on probation, and that concomitantly, being on probation for longer than a year was detrimental 'rather than being rehabilitative.' As previously noted, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible' (*People v. Conley*, *supra*, 63 Cal.4th at p. 657), not solely to changes that reduce 'punishment' as defined in contexts different than assessing whether *Estrada* is applicable. We thus conclude *Estrada* applies here, to a change in the law significantly reducing by two-thirds the amount of time a person can be placed on probation in a misdemeanor case." (*Burton*, *supra*, 58 Cal.App.5th at pp. Supp. 15–16.)

The Attorney General acknowledges *Burton*, but asserts it is not controlling. Nevertheless, we find it persuasive, and join at least two other courts that filed opinions after the supplemental briefing in this case was complete: *People v. Quinn* (Jan. 11, 2021, A156932) __ Cal.App.5th __ [pp. 6–13], from Division Four of this court; and *People v. Sims* (Jan. 12, 2021, D077024) __ Cal.App.5th __ [pp. 21–22], from the Fourth District.

In arguing that probation is not punishment for *Estrada* purposes, the Attorney General relies on cases characterizing probation as an act of

20

clemency or an alternative to punishment, principally on *People v. Howard* (1997) 16 Cal.4th 1081, 1092 (*Howard*), which held that when a trial court imposes sentence but suspends its execution, it lacks the authority to impose a new sentence upon revoking probation. (*Id.* at p. 1095.) In its discussion of the background law regarding probation, the *Howard* court explained: "Grant of probation is, of course, qualitatively different from such traditional forms of punishment as fines or imprisonment. Probation is neither 'punishment' (see § 15) nor a criminal 'judgment' (see § 1445). Instead, courts deem probation an act of clemency in lieu of punishment (cf. *In re Tyrell J.* (1994) 8 Cal.4th 68, 81), and its primary purpose is rehabilitative in nature (see *People v. Cookson* (1991) 54 Cal.3d 1091, 1097)." (*Howard, supra,* 16 Cal.4th at p. 1092.)

But none of these cases considered whether probation is punishment, or a reduction in a probation term is an "ameliorative[] change in the criminal law," for purposes of *Estrada*. And even if probation has been viewed in other contexts as an "act of clemency" or "qualitatively different from traditional forms of punishment," it can still be "punishment" under the broad view of that term discussed above. (See *People v. Sims, supra,* __ Cal.App.5th __ [pp. 18–19].)

Finally, the Attorney General argues that the context of AB 1950 makes clear the legislative intent that the statute apply only prospectively, first because it was enacted against the background of existing section 1203.4, subdivision (a)(1), which provides that the court may "in its discretion and the interests of justice," and under certain circumstances, allow the defendant to withdraw his or her plea, have the information dismissed, and be "released from all penalties and disabilities resulting from the offense of which he or she has been convicted, except as provided in Section 13555 of

21

the Vehicle Code."[6]  The plain text of this statute does not permit the court to terminate probation early, but in any event, a preexisting statute permitting the court to terminate probation in its discretion and "in the interest of justice" plainly does not sweep as broadly as a statutory limit on the length of any and all terms of probation, as contained in AB 1950, and thus the existence of section 1203.4 does not demonstrate a legislative intent that the statute apply only prospectively.[7]

The Attorney General next points to the argument of the Drug Policy Alliance in support of AB 1950 that "[t]he purpose of the bill is to end wasteful spending, to focus limited rehabilitative and supervisory resources

---

[6] "In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation, or in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under this section, the defendant shall, at any time after the termination of the period of probation, if he or she is not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw his or her plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if he or she has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in either case, the court shall thereupon dismiss the accusations or information against the defendant and except as noted below, he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted, except as provided in Section 13555 of the Vehicle Code."

[7] Valsecchi's reliance on *People v. Conley, supra*, 63 Cal.4th 646 is misplaced.  There, our Supreme Court held that the presumption of retroactivity was rebutted where the new law contained a section "creat[ing] a special mechanism that entitles all persons 'presently serving' indeterminate life terms imposed under the prior law to seek resentencing under the new law." (*Id*. at p. 657; see *id*. at pp. 657–661.)  Here, there is no comparable mechanism in AB 1950. (See *People v. Quinn, supra*, __ Cal.App.5th __ [pp. 14–15].)

on persons in their first 12 to 24 months of probation, and reduce the length of time that a person might be subject to arbitrary or technical violations that result in re-incarceration," asserting that this purpose is "forward looking." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1950 (2019–2020 Reg. Sess.) as amended June 10, 2020, p. 7.)  We do not agree that any of these purposes are exclusively forward looking, as they each can be achieved by shortening or ending the terms of probation for those already on probation.

Finally, the Attorney General argues that retroactive effect would "stop rehabilitative programs and relationships in midstream," leading to "havoc and thwarted rehabilitation."  However, this is a policy argument and does not amount to a showing of a legislative "clear intention concerning any retroactive effect," as required.  (*Estrada, supra*, 63 Cal.2d at p. 745.)  As our colleagues in Division Four observed:  "[T]he amendment of Assembly Bill No. 1950 reflects a categorical determination that a shorter term of probation is sufficient for the purpose of rehabilitation.  The court is not required to make a determination regarding dangerousness, the value of further probationary supervision, or any other consideration.  Rather, the Legislature has made that determination." (*People v. Quinn, supra*, __ Cal.App.5th __ [p. 15]; see *People v. Sims*, *supra*, __ Cal.App.5th __ [p. 26].)

## DISPOSITION

Valsecchi's probation is reduced to a term of two years.  In all other respects, the judgment is affirmed.

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Stewart, J.

*People v. Valsecchi* (A157683)