[No. D007854. Fourth Dist., Div. One. Aug. 15, 1989.]

THE PEOPLE, Plaintiff and Respondent, v,
TIMOTHY STARK, Defendant and Appellant.

**COUNSEL**

Elizabeth A. Barranco, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Rudolf Corona, Jr., and Yvonne H. Behart, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TODD, Acting P. J.**—A jury convicted Timothy Stark of three counts of forcible sexual contact with a child under the age of fourteen (Pen. Code,[1] § 288, subd. (b)). The trial court sentenced Stark to nine years in prison. He appeals, contending the trial court erred by (1) denying his motion to dismiss under section 995, (2) admitting testimony of the child's school psychologist regarding the child's learning disability and (3) admitting testimony regarding the child abuse accommodation syndrome.

### FACTS

For about ten years, Stark lived with his sister's family, which included nine-year-old James and six-year-old Anna. On June 5, 1987, James's and Anna's older sister, Rochelle, babysat the children while the parents were out of town. Rochelle noticed Stark acting peculiarly—he seemed nervous, going through the house shutting and locking all doors and windows, and started rambling to Rochelle after he asked to speak to her in private—and became alarmed. Rochelle decided to take the children to their grandmother's residence. En route, James said, "Boy, I'm glad we got out of there when we did," and Rochelle asked James if his uncle had ever hurt him in any way. James responded by pointing to his groin area and saying Stark had tickled his private parts. The following day Rochelle informed her parents about what James had said, and James's father asked Stark to leave their home. Stark asked why, and James's father told Stark he was a child molester. The two men started fighting.

James testified that on six occasions on six consecutive days, Stark approached him and lay down on top of him as he was lying on the living room floor. James said Stark put his hands into James's pants and tickled the boy's penis. James said he could not get out from under Stark because of

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Stark's weight. James said he kicked Stark in the stomach six times and once in the leg to make him stop. Anna testified she saw Stark lying on top of James with his hand in James's pants.

DISCUSSION

I

■ Stark contends the trial court erred by denying his section 995 motion, which was based on the argument that the prosecution failed at the preliminary hearing to make the requisite showing of force or duress under section 288, subdivision (b). The contention is meritless.

First, the requisite elements were shown. Under section 288, subdivision (b) it is a felony to commit any lewd act upon a child under the age of 14 years when the act is committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury . . . ." The record shows that at the preliminary hearing James testified Stark was lying on the living room floor when Stark lay on top of him, stuck his hand under James's pants and fondled his penis. James further testified he told Stark to stop to no avail and had to kick Stark in the stomach six times before Stark stopped and got up. James testified he was unable to move to get away while Stark lay on top of him. James said he did not disclose the molestation to anyone because he was "really, really scared." Anna testified she observed Stark lying on top of James and touching James's private parts while James tried to get Stark off of him. Anna also testified Stark told her if she told anyone about the molestation (1) he would kill her parents and grind up her dog and (2) she would turn into the devil.

In *People v. Cicero* (1984) 157 Cal.App.3d 465 [204 Cal.Rptr. 582], the Court of Appeal interpreted "force" as used in section 288, subdivision (b). The *Cicero* court said: "Where a defendant uses physical force to commit a lewd act upon a child under the age of 14, and the child suffers physical harm as a consequence, the defendant has committed a lewd act 'by use of force' under subdivision (b). Consent is no defense. Where no physical harm to the child has occurred, the prosecution has the burden of proving (1) that the defendant used physical force substantially different from or substantially in excess of that required for the lewd act and (2) that the lewd act was accomplished against the will of the victim. The prosecution may satisfy its burden on the latter issue by proving the physical force was such as would reasonably demonstrate that the lewd act was undertaken against the will of the victim under all circumstances, including the ages and sizes of the defendant and the victim. The prosecution need not prove that the victim

resisted the lewd act." (*People* v. *Cicero, supra,* 157 Cal.App.3d at pp. 484-485.)

Here, we have an adult male lying on top of a nine-year-old boy, who was rendered unable to move away because of the weight of the adult on top of him. The adult ignored the boy's request to get off of him and to stop fondling him. The molestation only stopped when the boy kicked the adult six times in the stomach. Clearly, Stark used physical force substantially different from and substantially greater than that necessary to fondle James.[2]

Second, even if there were not a sufficient showing at the preliminary hearing of the requisite elements for section 288, subdivision (b), Stark has not shown any prejudice from the purported defective commitment order. Relying on *People* v. *Elliot* (1960) 54 Cal.2d 498, 503 [6 Cal.Rptr. 753, 354 P.2d 225], Stark would have us adopt a now-discarded per se reversal rule for errors at the preliminary hearing stage. The problem with this position is that in *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941], our Supreme Court discarded the per se reversal rule of *Elliot*: "Henceforth irregularities in the preliminary examination procedures which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination. The right to relief without any showing of prejudice will be limited to pretrial challenges of irregularities. At that time, by application for extraordinary writ, the matter can be expeditiously returned to the magistrate for proceedings free of the charged defects." (*People* v. *Pompa-Ortiz, supra,* 27 Cal.3d at p. 529.)

## II

Testifying for the prosecution was Roberta Heiserman, a school psychologist who administered psychological tests on James in September 1985. Heiserman testified James has a learning disability that affects his ability to sequence events and put events in chronological order.

The prosecutor offered the following explanation for the testimony: "[James] has, on a number of occasions now in this courtroom, when being asked questions on direct, cross, redirect, recross, given a clear indication that he has a serious limitation on any questions that involve a specific time

---

[2] Having found there was sufficient evidence to make the requisite showing of force, it is unnecessary for us to address the element of duress.

period that are calling for sequencing and calling for mathematical concepts that could require, for example, did something happen before or after.

"And I think that it is one thing for him to be testifying and giving inconsistent statements. It's another for an expert who has actually tested him to be able to show that he is not retarded, on the one hand, when it comes to verbal ability, but that he is very limited, he has an exceedingly low score when it comes to the area of sequencing."[3]

 Stark, relying on Evidence Code sections 801 and 352, contends Heiserman's testimony was improperly admitted. The contention lacks merit on either ground.

Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

"(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

 Evidence Code section 801, subdivision (a) reflects California's approach to allowing expert opinion when it is desirable or helpful rather than

---

[3] Earlier in the trial proceedings, in relation to the proposed testimony of James's special education teacher, Mrs. Ianedas, who was the witness in this area that the prosecution originally sought to call, the prosecutor gave the following offer of proof: "[I] intended a five-minute type testimony where she would be interpreting tests indicating inspite [*sic*] of the fact that this child looks retarded and is hydrocephalic and has a very large head and has all of the physical characteristics of a retarded child, and, in fact, is in a special education class, that he is not retarded that he's reading at the 8th grade level, does well in vocabulary similarities tests which is a good indication of his verbal reasoning ability. But that he does have a learning disability that relates to sequencing and that he is not able to—for example, he has an exceedingly low score on [the] picture arrangement test in the Wisc series, which gives a clear indication of the poor sequencing ability. And he has difficulty with any numbers concepts such as whether or not any event—one event preceded another one or succeeded another one. [¶] He, because of his learning disability, does not have the ability to do that, that his number concepts are very elementary and very basic. He's probably at the first grade level with numbers. And I think without that knowledge of his specific disabilities, that it would be very possible for the jurors to just draw a conclusion that the child is retarded when he is not." Mrs. Ianedas, however, had not administered the tests to James, and Mrs. Heiserman, who did administer the tests to James, was eventually called.

restricting it only to situations where it is absolutely necessary. (1 Witkin, Cal. Evidence (3d ed. 1986) § 475, p. 447.) In *People* v. *Hopper* (1956) 145 Cal.App.2d 180, 191 [302 P.2d 94], the court succinctly expressed the appropriate criterion in adopting Professor Wigmore's statement: "[C]an a jury from this person receive appreciable help?" The Supreme Court put it this way: "[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of the expert would assist the trier of fact." (*People* v. *Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435].)

 Here, Heiserman's testimony concerning the extent of James's disabilities as established by the standardized tests was at the very least helpful to the trier of fact in assessing James's testimony.[4] Moreover, Evidence Code section 780 supports the admission of Heiserman's testimony. Evidence Code section 780 provides in relevant part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following:

"`. . . . . . . . . . . . . . . .

"(c) The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies." Heiserman's expert testimony explaining James's cognitive development as his ability to understand questions and communicate "falls well within the broad statutory description of 'any matter that has any tendency in reason' to bear on the credibility of a witness. (Evid. Code, § 780.)" (*People* v. *McDonald* (1984) 37 Cal.3d 351, 366 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].)

 As to Stark's point that the trial court abused its discretion under Evidence Code section 352, we note the section provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

---

[4]There was also an additional wrinkle here: James's physical appearance could very well lead lay persons to exaggerate his learning disabilities. Thus, it could be argued the expert opinion was necessary to ward off potential preconceived notions about retardation based on physical appearance in the minds of lay jurors.

The original prosecutor's estimate of approximately five minutes of testimony from the school expert was accurate: Heiserman's testimony took up nine complete pages in the reporter's transcript. Obviously, it did not involve an undue consumption of time. Stark has not demonstrated how the testimony confused the issues or misled the jury. Stark argues the testimony was prejudicial because his conviction rested on the jury believing James and Heiserman's testimony allowed the jury to ignore the deficiencies in James's testimony. This argument ignores the fact James's testimony was corroborated by an eyewitness, his sister Anna. We do not perceive any abuse of discretion by the trial court in allowing Heiserman's testimony. "Where expert opinion evidence is offered, much must be left to the discretion of the trial court . . . ." (*People v. Cole, supra,* 47 Cal.2d 99, 105.)

### III

▇▇ Stuart Ludwig, Ph.D., a licensed psychologist, testified concerning the "child abuse accommodation syndrome." Ludwig had not examined James.

Stark contends the trial court committed reversible error by allowing Ludwig's testimony. Stark maintains Ludwig's testimony was overly suggestive and fashioned to prove Stark molested James. We disagree.

In *People v. Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], the California Supreme Court held that expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove the witness was, in fact, raped. However, the *Bledsoe* court did not hold such testimony inadmissible for all purposes. "Clearly, the admissibility of expert testimony on a given subject must turn both on the nature of the particular evidence and its relation to a question actually at issue in the case." (*Id.* at p. 246.) The *Bledsoe* court, recognizing that rape defendants often attack the complainant's credibility by suggesting a delay in reporting the rape is inconsistent with having been raped, endorsed the use of evidence on rape trauma syndrome to rebut such an inference. (*Id.* at p. 247.) "[I]n such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths. [Citations.]" (*Id.* at pp. 247-248.)

Moreover, in *People v. Roscoe* (1985) 168 Cal.App.3d 1093 [215 Cal.Rptr. 45], in which the reasoning of *Bledsoe* was applied to expert testimony about the aftereffects of child molestation, the court held the dangers of expert testimony existed when the expert discussed the specific case being tried but were alleviated—if not removed—when the expert

discussed victims as a class. "Where the expert refers to specific events, people and personalities and bases his opinion as to credibility on his diagnosis of *this* witness, then the conclusion that the witness is credible rests upon the premise that the diagnosis is accurate, and that in fact molestation had occurred. The jury in effect is being asked to believe the diagnosis, to agree that the doctor's analysis is correct and the defendant is guilty. Such a result would subvert the sound rule adopted by a unanimous Supreme Court in *Bledsoe*. It follows, therefore, that the expert testimony authorized by *Bledsoe* to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand." (*People* v. *Roscoe, supra,* 168 Cal.App.3d at pp. 1099-1100, fns. omitted.)

In *People* v. *Bowker* (1988) 203 Cal.App.3d 385, 391-394 [249 Cal.Rptr. 886], this court—relying on *People* v. *Bledsoe, supra,* and the *Kelly-Frye* test (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [34 A.L.R. 145])—held evidence of the child sexual abuse accommodation syndrome is inadmissible to prove that a child has been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children. However, we held such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse. (*People* v. *Bowker, supra,* 203 Cal.App.3d at p. 393.) *Bowker* prescribed two requirements to the admissibility of child sexual abuse accommodation syndrome evidence:

First, the expert's testimony must be narrowly tailored to the purpose for which it is admissible, i.e., the prosecution is obligated to "identify the myth or misconception the evidence is designed to rebut" and the testimony must be limited to exposing the misconception by explaining why the child's behavior is not inconsistent with his or her having been abused. (203 Cal.App.3d at p. 394.)

Second, if requested the jury must be admonished "that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People* v. *Bowker, supra,* 203 Cal.App.3d at p. 394, original italics; see *People* v. *Bothuel* (1988) 205 Cal.App.3d 581, 587-588 [252 Cal.Rptr. 596].)

Here, the trial court—after hearing James's testimony and arguments by the prosecution and defense concerning the propriety of testimony

on child sexual abuse accommodation syndrome—limited Ludwig's testimony "to be used to rehabilitate the testimony of [James], rehabilitate his credibility insofar as it relates to the delay, specifically his delay in having reported incidents, any concealment, and any conflict in his testimony. [¶] The expert may present that evidence only by rendering his opinion as to victims as a class and not to this victim in particular." Ludwig's testimony did not exceed these boundaries. Stark's assertion that Ludwig's testimony was not confined to specific misconceptions about child sexual abuse victims, such as delay in reporting, is not supported by the record.[5] Stark has demonstrated no error on this appeal.

We conclude Ludwig's testimony was properly admitted.

### DISPOSITION

Judgment affirmed.

Benke, J., and Huffman, J., concurred.

---

[5] Nor can we find support in the record for the following comment by Stark: "As Dr. Ludwig further explained during cross-examination by defense counsel, for purposes of treatment, the child victim is to be believed and his or her experience validated." What the record does show is that Stark's trial counsel waived cross-examination.