Filed 10/18/21  P. v. Bolanos CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN CARLOS BOLANOS,<br><br>    Defendant and Appellant. | D078363<br><br><br>(Super. Ct. No. INF1700627) |

APPEAL from a judgment of the Superior Court of Riverside County, James S. Hawkins, Judge.  (Retired Judge of the Riverside Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Amanda E. Casillas, Deputy Attorneys General for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Juan Carlos Bolanos of continuous sexual abuse of his then 12-year-old daughter (Pen. Code,[1] § 288.5, subd. (a); count 1) and three counts of lewd and lascivious acts upon his daughter (§ 288, subd. (a); counts 2–4). The trial court sentenced him to an aggregate term of 16 years in state prison.

On appeal, Bolanos contends the trial court erred by failing to instruct the jury on the limited purpose of expert testimony regarding child sexual abuse accommodation syndrome (CSAAS); his attorney provided ineffective assistance of counsel by failing to object to the prosecutor's mischaracterization of the standard for reasonable doubt in her closing argument; and the court improperly imposed certain fines and fees at sentencing without holding a hearing on his ability to pay.

The People concede the instructional error but argue it was harmless given that the jury was properly advised of the limited nature of CSAAS testimony by the expert and by counsel during arguments, and evidence of Bolanos's guilt was overwhelming. The People also concede prosecutorial error but argue defense counsel's decision to not object during closing arguments was tactical and, again, any error was harmless because defense counsel and the court appropriately reinforced the correct standard of proof.

We agree with the People's concessions and conclude both the instructional and prosecutorial error were harmless. We also conclude Bolanos has forfeited his claim to an ability to pay hearing and, even if he did not, the trial court did not abuse its discretion by imposing the fines and fees. Accordingly, we affirm the judgment.

---

[1]    All further undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL HISTORY

In 2007, Bolanos began sexually abusing his daughter, Jane Doe, who was 12 years old.  Before Jane testified, the prosecution presented evidence that, in 2008, Bolanos had sexually abused another under-age girl, Janice Doe.[2]

Janice met Bolanos in early 2008, when she was 14 years old.  She played on a softball team with Jane at the time, and Bolanos was the team's assistant coach.  Bolanos would give her rides to and from practice and she would talk to him about problems she was having at home.  Janice recalled that Bolanos would often say nice things to her and would sometimes touch her in a "weird" way.  When the softball season came to an end, Janice began meeting Bolanos at a park near her house.  They would sit together in Bolanos's car and he would kiss her, rub her leg, and touch her breasts, and have her touch his erect penis.

In July 2008, Bolanos went to Janice's home while her parents were out.  He sat on Janice's bed and kissed her.  He then stood up, "pushed [Janice] back onto the bed," removed his pants, and asked Janice, "[a]re you going to take your clothes off?"  She removed her clothes, he got on top of her, and he "began trying to shove it in."  Janice told him:  "Please stop.  It's hurting."  Bolanos did not stop, telling her: "Just be patient."  Bolanos ejaculated into his shirt.  Janice went to the bathroom and saw that she was bleeding.

---

[2]     The prosecution introduced evidence of other uncharged sexual offenses pursuant to Evidence Code section 1108, subdivision (a) which provides:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Soon after, Janice's parents found out about the relationship and reported it to the police. The police asked Janice to make a pretextual phone call to Bolanos, during which he admitted having sexual intercourse with her. The prosecution played the call for the jury in Jane's case.

Bolanos was arrested in July 2008 for sexual abuse of Janice. On January 5, 2010, Bolanos was convicted of unlawful sexual intercourse with a child under the age of 16 (§ 261.5, subd. (d)) and unlawful lewd and lascivious act on a child under the age of 16 (§ 288, subd. (c)). Bolanos stipulated to the fact of these convictions and the stipulation was read to the jury in Jane's case.

Jane testified that Bolanos began sexually abusing her in 2007, when she was 12 years old. In the fall of 2007, Jane had just started middle school and was living with Bolanos, her mother, and two younger siblings. Her grandfather had recently moved into the house, so Jane was sharing a room and a bed with her brother. Jane had to get up for school earlier than her siblings and Bolanos left early in the morning for work, so he would wake her before he left.

One morning, Bolanos came into the room earlier than usual. Jane's brother was asleep. Bolanos got into the bed and laid next to Jane. He put his hand under Jane's shirt and touched her breasts. Bolanos did this on at least three other occasions. Jane started wearing a bra to bed in an attempt to deter Bolanos, but he fondled her under her bra. Jane always pretended to be asleep during the incidents, and Bolanos would eventually leave the room, returning later to wake her up for school. On one occasion, Jane attempted to roll over towards her brother, but Bolanos grabbed her hand and pulled her so she was lying on her back. He then placed her hand on his erect penis,

over his clothes. On at least one other occasion, Bolanos kissed Jane on the mouth and she felt his teeth graze against her lips.

The assaults suddenly stopped sometime around February 2008. Jane recalled that she played softball and the regular "rec ball season" ended around that same time. Jane remembered Janice being on the team. They were not particularly close, but Jane recalled that Bolanos would sometimes give Janice a ride home.

That July, Jane's mother, C.B.,[3] told Jane that Bolanos had been arrested for "doing something with a minor." Although Jane wondered if she was *that* minor, she did not tell her mother what had happened to her.

Jane finally disclosed the abuse in 2012. She had started getting into "really bad things" around the time Bolanos was released from "jail," and wanted to tell her mother what had happened so she could get help. Jane did not disclose the abuse sooner because she was ashamed and embarrassed and because she saw how the trial with Janice negatively affected her mother, and how their family was broken apart as a result.

In 2017, when Jane was 21 years old, she discovered Bolanos had a new girlfriend who was just a couple of years older than herself. Jane sent the girlfriend the booking photo of Bolanos when he was arrested for the offenses against Janice, and told her some details of what Bolanos had done to her.

C.B. testified and confirmed that Jane disclosed the abuse to her for the first time in 2012. She said she confronted Jane because she could tell her daughter was getting into trouble. Jane told her mother that she "wouldn't understand" because she did not know what had happened to her.

---

[3] Pursuant to rule 8.90(b)(10) of the California Rules of Court, we refer to private citizen witnesses by the initials of their first and last names only.

5

Eventually, Jane told C.B. that Bolanos had molested her when she was younger.

C.B. immediately tried to confront Bolanos, but was unable to find him. She then contacted the Riverside County Sheriff's Department and detectives interviewed Jane. Although C.B. called the Sheriff's Department several times to check on the status of the case, for unknown reasons, Bolanos was not arrested for the offenses against Jane until 2017.

C.B. further testified that Bolanos contacted her in 2017 when Jane began contacting his girlfriend. Bolanos told C.B. to tell her kids "to stop putting stuff on Facebook, sending pictures of my mugshot to my friends." They exchanged several more messages and Bolanos never denied any of the accusations Jane made in the exchanges with his girlfriend.

Bolanos testified in his own defense and denied he ever touched Jane in an inappropriate manner. He claimed that Jane resented him because he did not pay enough attention to her after he had left the family. He testified he left C.B. because they were arguing. Bolanos admitted he had a relationship with Janice, but despite admitting the prior conviction of unlawful sexual intercourse with a minor, he denied they had sexual intercourse because his definition of "sex" is "full intercourse, multiple times" for "about a half hour, 20 minutes, an hour, not for minutes." In closing argument, defense counsel argued C.B. and Jane made up the allegations because they were "scorned" and seeking revenge.

DISCUSSION

I.

*The Instructional Error Was Harmless*

Dr. Jody Ward, a clinical and forensic psychologist, testified about CSAAS in the prosecution's case-in-chief. She clarified that she had never

6

met Jane, had not reviewed any information regarding her case, and was not there to testify regarding Jane, specifically. Instead, she testified that children, in general, that are sexually abused tend to display a pattern of behaviors that has been identified as CSAAS, and that those patterns can help adults understand why children respond to sexual assault in ways that they might not expect. In particular, she identified and explained the following five hallmarks of sexual assault response in children: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation. She further explained that CSAAS starts with the presumption that the child has been sexually assaulted and cannot be used as a diagnostic tool to determine whether or not a sexual assault occurred in the first instance.

Expert testimony on CSAAS is admissible " 'for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation' " (*People v. Wells* (2004) 118 Cal.App.4th 179, 188, quoting *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301), but it "may not be used to corroborate the victim's claims of abuse" (*People v. Housley* (1992) 6 Cal.App.4th 947, 955 (*Housley*)). Although there is disagreement concerning whether a defendant is entitled sua sponte to an instruction specifically limiting the jury's use of this evidence,[4] the trial court is required to provide

---

[4] The Court of Appeal in *Housley* concluded trial courts have a sua sponte duty to give a limiting instruction whenever an expert is called to testify regarding CSAAS. (*Housley, supra,* 6 Cal.App.4th at p. 959.) Other courts have disagreed and held the limiting instruction is necessary only when requested. (See *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1073–1074 (*Mateo*) [disagreeing with *Housley* and concluding, "[t]he instruction need only be given if requested"]; *People v. Stark* (1989) 213 Cal.App.3d 107, 116 (*Stark*) [noting the instruction must be provided "if requested"]; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735 [same]; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587–588 [same].) We need not and do

such an instruction where one is requested.  (See *Mateo, supra,* 243 Cal.App.4th at pp. 1073–1074; *Stark, supra,* 213 Cal.App.3d at p. 116; cf. *People v. Nudd* (1974) 12 Cal.3d 204, 209 [Generally, "absent request by a party, there is no duty to give an instruction limiting the purpose for which evidence may be considered."].)

Here, the prosecutor requested the trial court give a limiting instruction regarding the CSAAS expert testimony,[5] but, for reasons that are not clear, the instruction was not given to the jury.  On appeal, the People concede the omission of the limiting instruction was error and we agree with that concession.  However, the parties dispute whether the error was prejudicial, and which standard of prejudice we should apply.

The People contend that we should apply the *Watson* standard of prejudice and consider whether " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "  (See *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*).)

Bolanos asserts, to the contrary, that we should apply the harmless beyond a reasonable doubt standard of prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  As he contends, the failure to provide the limiting instruction relieved the prosecutor of its burden of proof

_____

not address this issue in this case.  As we discuss next, the prosecutor requested a limiting instruction on CSAAS testimony, and the People concede the trial court's omission of the instruction was error.

5     CALCRIM No. 1193 provides the standard limiting instruction and states:  The expert's "testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her).  [¶]  You may consider this evidence only in deciding whether or not [the alleged victim's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

beyond a reasonable doubt, thereby violating his constitutional rights to due process and a jury trial. However, he does not develop the argument or provide any authority to support his conclusion.[6] At most, he asserts, in a conclusory fashion, that the jury "undoubtedly used the expert's testimony as evidence that appellant committed the charged crimes." He then oddly relies on *Housley*—in which the court applied a *Watson* standard of prejudice— without any meaningful explanation as to why a different standard of prejudice is appropriate in this case. (See *Housley, supra,* 6 Cal.App.4th at pp. 958–959 [concluding the failure to provide a limiting instruction on CSAAS expert testimony was harmless because "it [wa]s not reasonably probable appellant would have received a more favorable verdict if an appropriate limiting instruction had been given"].)

We are not persuaded that the failure to provide the limiting instruction relieved the prosecutor of the appropriate burden of proof, or otherwise infringed upon Bolanos's constitutional rights. Accordingly, we conclude the standard of prejudice articulated in *Watson* applies. Other courts have similarly applied the *Watson* standard of prejudice with respect to instructional errors involving CALCRIM No. 1193. (See *People v. Munch* (2020) 52 Cal.App.5th 464, 474 [applying the *Watson* standard of prejudice to a CALCRIM No. 1193 instructional error]; *Mateo, supra*, 243 Cal.App.4th at p. 1074 [same]; *People v. Bowker* (1988) 203 Cal.App.3d 385, 395 [finding error harmless under *Watson*].)

---

6    Bolanos cites *People v. Larsen* (2012) 205 Cal.App.4th 810, without discussion, in his reply brief. *Larsen* does not support his assertion. There, the court determined the *Watson* standard of prejudice applied where the trial court failed to give a mental disorder instruction because the omission "did not remove from the jury's consideration or incorrectly define the intent element of the [underlying] offenses." (*Id*. at pp. 829–830.)

9

Regardless, though, we would find the error harmless under either the *Watson* or *Chapman* standard. The purpose of the limiting instruction is to ensure the jury does not improperly use the expert's testimony regarding CSAAS to corroborate the victim's claims. (*Housley, supra,* 6 Cal.App.4th at p. 958.) Here, Dr. Ward directly addressed that concern. She made clear that she was not there to testify about Jane, that she had not spoken to Jane, and that she had not reviewed any materials regarding Jane's case. Instead, her testimony was appropriately limited to " 'victims as a class.' " (See *Stark, supra*, 213 Cal.App.3d at p. 117.) In addition, Dr. Ward explained that CSAAS starts with the assumption that the child has been sexually abused and that it cannot be used as a diagnostic tool to determine whether a particular child had been abused.

The prosecutor also used Dr. Ward's testimony in the manner permitted. In her opening statement, she told the jury they would hear that Jane did not initially disclose the abuse, but that Dr. Ward would explain delayed disclosures were quite normal in such cases. In her closing argument, the prosecutor reiterated that Dr. Ward testified about "dispelling the myths or misconceptions of disclosure," and explained how Jane's stated reasons for delaying disclosure were consistent with Dr. Ward's explanation of CSAAS. Moreover, both the prosecutor and defense counsel reiterated in closing arguments that CSAAS starts with the assumption that the child was sexually abused, further reinforcing that Dr. Ward's testimony was not proffered as evidence that the abuse actually occurred.

In addition, the trial court provided the jury with the more general instructions regarding expert witness testimony pursuant to CALCRIM No. 332. The court instructed the jurors that they were not required to accept Dr. Ward's opinions as true, that it was up to them to determine the meaning

10

and importance of her opinions, and that they should evaluate the believability of Dr. Ward in the same manner as any other witness. CALCRIM No. 332, standing alone, has been found sufficient absent a request for an additional limiting instruction specific to expert testimony on CSAAS. (See *Mateo, supra,* 243 Cal.App.4th at pp. 1073–1074.)

Although the People concede the failure to give the additional limiting instruction was error here, we consider the jury instructions as a whole when determining whether there was a likelihood the jury was misled. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.) Given the limited scope of Dr. Ward's testimony, the limitations placed on that testimony by both counsel's arguments, and the more general instruction on expert testimony, we perceive no reason to doubt that the jury in this case considered the testimony in an appropriate manner.

Bolanos contends the People's reliance on Dr. Ward's testimony to bolster Jane's credibility suggests prejudice under either standard. As explained, though, the People relied on Dr. Ward's testimony in a manner consistent with the limiting instruction, that is, to rebut the defense's assertion that Jane's delayed disclosure suggested her allegations were fabricated. As Bolanos concedes, the court in *Housley* found the failure to provide a limiting instruction was "clearly harmless," primarily, because, as here, the expert "told the jury she had not met the victim and had no knowledge of the case" and "[h]er testimony was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim." (*Housley, supra,* 6 Cal.App.4th at p. 959.) Although the court in *Housley* went on to note that several witnesses explained the victim's retraction, that was not an issue here because Jane never retracted her allegations. (*Ibid.*)

11

Further still, the evidence of guilt in this case was overwhelming. Bolanos contends the entire case came down to Jane's credibility as there were no direct witnesses to the sexual abuse. To the contrary, the prosecution presented compelling evidence of Bolanos's prior sexual abuse of Janice, from which the jury was entitled to infer that Bolanos "had a propensity to commit such crimes, which in turn may show that he committed the charged offenses" involving Jane. (*People v. Falsetta* (1999) 21 Cal.4th 903, 923; Evid. Code, § 1108.) Bolanos does not challenge the admissibility of the propensity evidence, and instead asks us to reweigh the evidence, asserting it was "not particularly relevant" because Janice was not his daughter and "was not an unwilling participant." We decline to do so.

Moreover, to the extent credibility was at issue, there was ample basis for the jury to conclude Bolanos was not a credible witness. As the prosecutor pointed out, he initially lied to the police about his conduct with Janice and, even on the stand, continued to dispute what he had already admitted—in both the recorded pretext call that was played for the jury and the stipulation to his convictions for unlawful sexual intercourse with a minor. Further still, he contested even trivial details he had previously admitted, such as whether or not he was an assistant coach on Jane and Janice's softball team. By contrast, Jane was consistent and unwavering in her description of the sexual abuse.

We therefore conclude the trial court's omission of the limiting instruction on expert testimony regarding CSAAS was harmless under either the *Watson* or *Chapman* standard.

## II.

*Defense Counsel Did Not Provide Ineffective Assistance of Counsel*

Bolanos contends defense counsel rendered ineffective assistance by failing to object when the prosecutor mischaracterized the standard of reasonable doubt during her closing argument. The People concede the prosecutor did err in her explanation of reasonable doubt, but assert defense counsel's decision to not object was both tactical and not prejudicial. Again, we agree with the People's concession and conclude the error was not prejudicial.

The prosecutor made the following statements regarding the burden of proof during her closing argument:

> "So my burden is to prove this case beyond a reasonable doubt, not all possible doubt, not a shadow of a doubt. We'd never leave if that were the case. Okay. So it's beyond a reasonable doubt. Is it reasonable that the defendant had sex with (Janice) -- excuse me. Is it reasonable that the defendant didn't have sex with (Janice)? No.

> "The law says you have to look at everything, the totality of the evidence. You can't just look at one fact in a vacuum. You have to look at everything, and it's not reasonable that he didn't have sex with (Janice) – absolutely not. The evidence does not show that.

> "Is it reasonable that (Jane) made it up? No. Is it possible? Sure. But not reasonable when taken into consideration with all the evidence, the details of what she describes, her age now, her consistency throughout the years. She's never wavered. It's possible that she made it up, but it's not reasonable.

> "Is it reasonable that the defendant is a child molester? Absolutely. Absolutely. That is what the evidence shows."

Defense counsel did not object, but he did address the burden in his own closing argument moments later. He stated:

13

"Ladies and gentlemen, . . . I'm going to read you the reasonable doubt instruction. Remember, if one of the elements is not proved beyond a reasonable doubt, the defendant is entitled to an acquittal no matter if the other elements are proved. I believe that's Number 220. Proof beyond a reasonable doubt -- this is 220 -- leaves you with an abiding conviction that the charge is true."

To establish ineffective assistance of counsel, Bolanos must show defense counsel performed below the standard of reasonableness under prevailing professional norms *and* that there is a reasonable probability the result would have been more favorable to him but for that substandard performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–688 (*Strickland*); *People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

"Ineffective assistance of counsel claims are rarely cognizable on appeal," as we give deference to trial counsel's tactical choices and the record rarely provides information regarding trial counsel's strategy. (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1329; *Strickland, supra,* 466 U.S. at pp. 690–691; *People v. Wilson* (1992) 3 Cal.4th 926, 936; *People v. Lewis* (2001) 25 Cal.4th 610, 661 (*Lewis*) ["Because we accord great deference to trial counsel's tactical decisions, counsel's failure to object rarely provides a basis for finding incompetence of counsel."].) Where the record is silent as to counsel's motivation, the reviewing court must reject an ineffective assistance of counsel claim "unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

"[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one." (*People v. Padilla* (1995) 11 Cal.4th 891, 942 (*Padilla*), overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

14

Objecting during the prosecutor's argument runs the risk of annoying the jury or drawing extra attention to the improper argument. (See *People v. Welch* (1999) 20 Cal.4th 701, 754 [defense counsel "could reasonably have determined that the risks of raising the objection and offending or annoying the jury outweighed whatever benefit might have been obtained from prosecutorial remarks that were little likely to prejudice his client"]; *People v. Ghent* (1987) 43 Cal.3d. 739, 773 ["Counsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments."]; *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["while requesting an admonition was one tactical option, counsel could also have decided that objecting would focus the jury's attention . . . in ways that would not be helpful to the defense"].)

Here, rather than run those risks, defense counsel made a reasonable tactical decision to forego the objection and direct the jury to the court's explanation of the burden of proof. (See *Lewis, supra,* 25 Cal.4th at p. 661; *Padilla, supra,* 11 Cal.4th at p. 942; *People v. Johnsen* (2021) 10 Cal.5th 1116, 1162–1163 [concluding defense counsel's strategic decision to rely on counterarguments, when possible, was not objectively unreasonable].) We defer to counsel's tactical decision and conclude he did not perform below the standard of reasonableness under prevailing professional norms. Further, there is not a reasonable probability the result would have been more favorable to Bolanos if his counsel had objected. (*Strickland, supra,* 466 U.S. at p. 694 ["defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"].)

Bolanos relies on *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*) to assert there was a reasonable probability the prosecutor's improper argument

caused one or more jurors to convict him based on a lower standard of proof. In *Centeno*, our Supreme Court concluded it was improper for the prosecutor to repeatedly suggest "that the jury could find [the] defendant guilty based on a 'reasonable' account of the evidence," and that defense counsel provided ineffective assistance of counsel by failing to object. (*Id.* at pp. 673, 675, italics omitted.) The Court noted the prosecutor made the improper statements in her *rebuttal* argument, such that "defense counsel had no opportunity to counter it with argument of his own," and "[h]is only hope of correcting the misimpression was through a timely objection and admonition from the court." (*Id.* at p. 676.) The Court then went on to further conclude, "[g]iven the closeness of the case and the lack of any corrective action, there is a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt." (*Id.* at p. 677.)

To the contrary, here, the prosecutor's statements were not made in rebuttal and defense counsel *did* take corrective action. Defense counsel promptly redirected the jury to the appropriate instruction and clarified that, "[p]roof beyond a reasonable doubt . . . leaves you with an abiding conviction that the charge is true." Moreover, as defense counsel's arguments to the jury suggest, the trial court instructed the jury regarding the appropriate burden of proof just before the prosecutor's closing argument. The court instructed the jury that:

> "We all know by now -- we talked about it a lot -- a defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove the defendant guilty beyond a reasonable doubt. So whenever I tell you the People must prove something, like the elements of the charges, I mean they must prove it beyond a reasonable doubt.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge or charges are true. Evidence need not eliminate all possible doubt because we know everything in life is open to some possible or imaginary doubt.

"So in deciding whether the People have proved their case beyond a reasonable doubt, you should impartially compare and consider all the evidence that was received throughout the entire trial, and unless that evidence proves the defendant guilty beyond a reasonable doubt, he's entitled to an acquittal and you must find him not guilty."

Thus, the prosecutor's single misstatement was bookended by a correct statement of the prosecutor's burden of proof from the court and defense counsel's reminder to the jury of the court's instruction. In that context, there is no reasonable probability the jury in this case convicted Bolanos based on an incorrect understanding of the burden of proof beyond a reasonable doubt. (See *Centeno, supra,* 60 Cal.4th at p. 676; *Strickland, supra,* 466 U.S. at pp. 686–688.)

Bolanos further contends the failure to object was prejudicial because this case was "a credibility contest" and any lessening of the burden of proof made it easier for the jury to believe Jane's version of the events. As we have already discussed, we disagree. The prosecution presented compelling propensity evidence and, overall, the evidence of guilt was strong. We therefore conclude Bolanos has not met his burden to establish his trial counsel provided ineffective assistance of counsel.

## III.

*The Trial Court Did Not Err by Imposing Fines and Fees*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Bolanos asserts the trial court erred by imposing a $10,000 restitution fine pursuant to section 1202.4, as well as several other lesser fines and fees, without holding an ability to pay hearing. We conclude Bolanos forfeited the

17

claim, and, in any event, the trial court did not abuse its discretion in determining he had the ability to pay the fines and fees it imposed.

In *Dueñas*, the Court of Appeal held that due process requires the trial court to hold an ability to pay hearing before imposing fines, fees, or assessments and that the burden to prove ability to pay is on the prosecution. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1164, 1172.) The court further held that execution of any restitution fine imposed under section 1202.4, subdivision (b), must be stayed "until and unless" the trial court holds an ability to pay hearing and the People demonstrate the defendant has the ability to pay the restitution fine. (*Ibid.*) But "[o]ther courts, including this court, have disagreed with *Dueñas* on these key principles." (*People v. Keene* (2019) 43 Cal.App.5th 861, 863; see, e.g., *People v. Cota* (2020) 45 Cal.App.5th 786, 795; *People v. Allen* (2019) 41 Cal.App.5th 312, 326 ["[W]e would adopt the reasoning of the numerous courts that have rejected *Dueñas*'s due process analysis."]; *People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946; *People v. Kopp* (2019) 38 Cal.App.5th 47, 93–98 (*Kopp*), review granted Nov. 13, 2019, S257844.) Our Supreme Court is currently considering the viability of *Dueñas* as it pertains to whether a trial court must consider a criminal defendant's ability to pay assessed fines and fees, and if so, which party bears the burden of proof. (*Kopp*, *supra*, 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

However, even before *Dueñas*, section 1202.4 expressly permitted challenges to the imposition of a restitution fine in excess of the statutory minimum of $300 based on the inability to pay. (§ 1202.4, subds. (b)(1), (d); *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*); *People v. Lewis* (2009) 46 Cal.4th 1255, 1321.) Section 1202.4, subdivision (d) provides, in relevant part: "In setting the amount of the fine pursuant to subdivision

18

(b) *in excess of the minimum fine* pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay[.]" (Italics added.) The statute also makes clear that "[a] defendant shall bear the burden of demonstrating [his or her] inability to pay." (§ 1202.4, subd. (d).) In cases since *Dueñas*, courts have clarified "it is [the defendant's] burden to make a record below as to their ability to pay these [fines, fees, and] assessments." (*Kopp, supra*, 38 Cal.App.5th at p. 96; *People v. Santos* (2019) 38 Cal.App.5th 923, 934 (*Santos*) ["it is the defendant's burden to demonstrate an inability to pay, not the prosecution's burden to show the defendant *can* pay, as the *Dueñas* decision might be read to suggest"]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 ["Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed."].)

When a defendant does assert an inability to pay certain fines and fees, the trial court may consider any relevant factors, including defendant's "housing status, mental illness or disability, receipt of government benefits, and realistic ability to earn prison wages or obtain employment." (*Santos, supra* 38 Cal.App.5th at p. 934.) We review the trial court's determination that a defendant does have the ability to pay the fines and fees imposed for an abuse of discretion. (*People v. Lewis, supra,* 46 Cal.4th at p. 1321; *People v. Potts* (2019) 6 Cal.5th 1012, 1057.)

Here, defense counsel objected to the imposition of the fines and fees, including the $10,000 restitution fine pursuant to section 1202.4, "because there was no evaluation of [Bolanos's] ability to pay." Defense counsel did not request a separate hearing and the only factor counsel raised regarding Bolanos's ability to pay was that "[h]e's been incarcerated for a long time."

19

The trial court addressed that concern by indicating the fines and fees "could be collected from any earnings that he might have during his time in prison or on parole." Defense counsel did not pursue the issue further.

Bolanos contends the exchange did not constitute a proper hearing on his ability to pay. Bolanos relies on *Dueñas*, in which the court concluded the trial court has an obligation "to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before imposing certain fines and fees, but *Dueñas* does not provide any further details regarding the structure of the "ability to pay hearing" or otherwise indicate what qualifies as a "proper" hearing. (See *Dueñas, supra,* 30 Cal.App.5th at p. 1164.) Bolanos asserts the court must afford the defendant an opportunity to present evidence regarding their ability to pay but Bolanos did not raise that issue or ask for a separate evidentiary hearing in the trial court. Accordingly, he has forfeited the issue on appeal. (See *People v. Scott* (1994) 9 Cal.4th 331, 356 (*Scott*) ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"]; *Gutierrez, supra,* 35 Cal.App.5th at p. 1033.)

Regardless, we find no abuse of discretion in the trial court's imposition of the fines and fees. As the trial court stated, Bolanos had the ability to pay from earnings he may receive "during his time in prison or on parole." Bolanos asserts he will not be able to pay the fines and fees from his prison wages because prison wages are extremely low. However, his sentence is 16 years and, as the court noted, he can also earn wages after his release, including while on parole. It is well settled that the trial court may rely on a defendant's ability to earn prison wages, even if those wages are low, as well as the ability to earn additional wages after release, to find the defendant has

ability to pay fines and fees imposed.  (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [court may consider defendant's ability to pay in the future, including "defendant's ability to obtain prison wages and to earn money after his release from custody"]; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [defendant did not show inability to pay $10,000 restitution fine simply because prison wages would make it difficult, it would take a long time, and the fine might never be paid]; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377 [a trial court may consider the defendant's future ability to pay, including his ability to earn wages while in prison].)

Bolanos further asserts his income at the time of his arrest was not sufficient to cover the cost of his living expenses and that he, therefore, will not likely have the ability to pay the fines and fees after his release.  Again, Bolanos forfeited this issue by failing to raise it in the trial court.  (See *Scott, supra,* 9 Cal.4th at p. 356; *Gutierrez, supra,* 35 Cal.App.5th at p. 1033.) Regardless, Bolanos asserts he was earning $14 an hour and his monthly income was $600 at the time of his arrest, but those numbers suggest he was only working approximately 43 hours per month.  Bolanos could earn additional wages by simply working additional hours upon his release.  In addition, Bolanos indicated he lived with his parents to provide financial support to them, and, when asked if he was willing to pay restitution to Jane, he did not raise any concerns about his ability to do so and, instead, stated, " 'Yes, without a doubt, if she needs my help, I am there for her.' "

We therefore conclude the trial court did not abuse its discretion by imposing the $10,000 restitution fine pursuant to section 1202.4 or any of the various lesser fines and fees.

## DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:


HALLER, Acting P. J.


GUERRERO, J.